## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

Joshua J. Angel
2 Park Avenue
New York, NY 10017
(917) 714-0409,

        Plaintiff,

     v.

The Federal Home Loan Mortgage Corporation,
Christopher S. Lynch, Raphael W. Bostic, Carolyn H.
Byrd, Lance F. Drummond, Thomas M. Goldstein, Richard
C. Hartnack, Steven W. Kohlhagen, Donald H. Layton,
Sara Mathew, Saiyid T. Naqvi, Nicolas P. Retsinas, Eugene
B. Shanks, and Anthony A. Williams, and Federal National
Mortgage Association, Egbert L.J. Perry, Amy E. Alvin,
William T. Forrester, Brenda J. Gaines, Frederick B.
Harvey III, Robert H. Herz, Timothy J. Mayopoulous,
Diane C. Nordin, Jonathan Plutzik, and David H. Sidwell,

        Defendants,

    And

The Federal Housing Finance Agency as Conservator for
The Federal Home Loan Mortgage Corporation and The
Home Loan Mortgage Association,

        Nominal Defendant.

**Case: 1:18-cv-01142    (F Deck)**
**Assigned To : Boasberg, James E.**
**Assign. Date : 5/21/2018**
**Description: Pro Se Gen. Civil**

## COMPLAINT

    Joshua J. Angel, ("Plaintiff") on behalf of himself as a Federal Home Loan Mortgage

Corporation and Federal National Mortgage Association preferred stock shareowner

("Plaintiff"), by and through the undersigned counsel, submits this Complaint ("Complaint")

against Federal Home Loan Mortgage Corporation ("Freddie Mac"), and its board of director

RECEIVED

MAY 2 1 2018

Clerk, U.S. District and
Bankruptcy Courts

members as of August 17, 2012, Christopher S. Lynch, Raphael W. Bostic, Carolyn H. Byrd, Lance F. Drummond, Thomas M. Goldstein, Richard C. Hartnack, Steven W. Kohlhagen, Donald H. Layton, Sara Mathew, Saiyid T. Naqvi, Nicolas P. Retsinas, Eugene B. Shanks, and Anthony A. Williams, ("Freddie Mac Directors", or  "Freddie Mac Director Defendants," and collectively with Freddie Mac, the "Freddie Mac Defendants"); and against the Federal National Mortgage Association ("Fannie Mae,"), and its board of director members as of August 17, 2012, Egbert L.J. Perry, Amy E. Alvin, William T. Forrester, Brenda J. Gaines, Frederick B. Harvey III, Robert H. Herz, Timothy J. Mayopoulous, Diane C. Nordin, Jonathan Plutzik, and David H. Sidwell ("Fannie Mae Directors", or "Fannie Mae Director Defendants" and with Fannie Mae the "Fannie Mae Defendants" and collectively with the Freddie Mac Defendants "Fannie/Freddie" the "GSEs", "Companies", "Directors", "Director Defendants" and "Defendants"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based on, *inter alia*, documents and testimony in the public record (including certain documents produced by the government in a related case that have already been entered into the public record), as well as the investigation of Plaintiff.

## NATURE AND SUMMARY OF THE ACTION

1.     This action is brought by Plaintiff as holder of both Fannie Mae, and Freddie Mac preferred stock for damages incurred in connection with each of the Companies' entry, on August 17, 2012, into a third amendment of the September 6, 2008 senior preferred stock purchase agreement ("Senior Preferred", and "SPSPA", respectively) between Treasury, and the Federal Housing Finance Agency, conservator for Freddie Mac and Fannie Mae ("Conservator"), acting in name of, and on behalf of both Freddie Mac and Fannie Mae in advance of the

1" = "1" "HF 12081560v.1" "" HF 12081560v.1

Conservator's appointment of a board of directors for each company ("Board(s)") to assist it in the Companies' management post conservatorship.

2.      This action for money damages against the Defendants arises out of the Defendants' joint and several conduct, in breach of the contractual and fiduciary duties which they owed - and continue to owe in concert - to act in a manner consistent with the Conservator's obligations (A) to "preserve and conserve the assets and property" of the Companies in its management of the Companies, and (B) as HERA (defined below) endowed possessor of the plenary management "rights, titles, power and privileges" of Freddie Mac and Fannie/Freddie equity owners in general, and their junior in payment (*i.e.,* to Senior Preferred) preferred shareowners ("Junior Preferred Shareholders" and "Junior Preferred") in particular.

3.      As set forth more fully below, on August 17, 2012, the Conservator, with rubber stamp approval of each Board, entered into a third amendment to the SPSPA (the "Third Amendment"), in per se anticipatory breach of each of the Defendant's joint and several contractual and fiduciary duties to the Plaintiff in particular, and their respective Junior Preferred equity owners in general.

4.      Prior to the Third Amendment, the Senior Preferred stockholder (*i.e.,* Treasury ) was entitled to "receive, ratably, when, as and if declared each of by the Fannie/Freddie Boards in its sole discretion . . ." cumulative cash dividends at the annual rate per share equal to the shares' then-current Dividend Rate (*i.e.,* ten percent).[1]   The Third Amendment, redefined the "Dividend Rate" to "the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter, less the then Applicable Capital Reserve Amount, exceeds zero." (the "Net Worth Sweep").   In other words, the Third Amendment provides for endless

---

[1] In the event, however, that a Company "failed to pay dividends in cash in a timely manner as required," the rate would increase to twelve percent (12%).

payment of a quarterly dividend to Treasury, equal to substantially all of each Company's net profits.

5.      Defendants possessed not a single *bona fide* business reason for entering into the Third Amendment, without concurrently making certain of its fairness and legality with respect to, and in keeping with, their contractual and fiduciary obligations to Plaintiff.   Recently produced documents make clear that the Federal Housing Finance Agency (hereinafter "FHFA Regulator" or "FHFA") and FHFA in its capacity of  Conservator both fully understood that Third Amendment completely undermined the FHFA Regulator and Conservator statutory mandate "to preserve and conserve" Fannie/Freddie assets.   As one administration member noted, "all investors" would soon understand that the Net Worth Sweep "should lay to rest permanently the idea that the outstanding privately held pref[erred shares] will ever get turned back on." [Emphasis Supplied]

6.      The Third Amendment, however, did **not** relieve the Conservator, or the Defendants of their obligations to, *inter alia*, ensure that the Companies were not improperly stripped of their assets.   In fact, under the Third Amendment, the Directors at all relevant times herein retained the power to declare Senior Preferred stock dividends in their "**sole discretion**". (Emphasis Supplied).[2]

7.      Fannie Mae and Freddie Mac were both, at different times, chartered by the United States Congress (hereinafter collectively with Treasury, and other federal agencies, the "Federal Government").

---

[2] In fact, the Third Amendment expressly provides that "[f]or each Dividend Period from January 1, 2013, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, *as and if declared by the Board of Directors, in its sole discretion*, out of funds legally available therefor, cumulative cash dividends in an amount equal to the then-current Dividend Amount." (Emphasis Added).

1" = "1" "HF 12081560v.1" "" HF 12081560v.1

8.     The Federal Government's guarantee of payment for the securities, and other financial obligations ("Financial Obligations"), of the GSEs was neither expressly assumed, or denied, as its implicit guaranty of payment over time became universally accepted for GSEs' debt and equity securities' full embrace. These instruments were "Government securities" within the general classification of Federal Government Financial Obligations issued with implicit Federal Government guaranty of payment (the "FG Implicit Guaranty").[3]

9.     World financial markets and investor perception of the Federal Government's implicit guaranty of GSEs Financial Obligation payments arose over time through a combination of (a) their interpretation of various Federal Government agencies statutory as "Government Securities", and (b) the Federal Government's complicity in allowing, and not refuting, the general perception of Fannie/Freddie Financial Obligations enjoyment of a FG Implicit Guaranty of payment

10.    The FG Implicit Guaranty of Fannie/Freddie Financial Obligations was critical to the GSEs' ability to market, and successfully sell, billions of dollars of Fannie/Freddie packaged guaranteed debt, and approximately $22 billion of their Junior Preferred shares as riskless perpetual capital suitable for financial institution tier one capital holding in the pre-conservatorship period of less than one year, from late 2007 through May 2008.  Fannie Mae's ability to sell $4.8 billion of its Junior Preferred shares less than four months prior to the Company's September 6, 2008, entry into conservatorship, was the undoubted result of market acceptance and reliance on: (a) the FG Implicit Guaranty of Junior Preferred dividend, and principal payment; and (b) Federal Government promotion of the shares as essentially risk free Government Securities.

---

[3] *See* "The 2008 Federal Intervention to Stabilize Fannie Mae and Freddie Mac," Federal Reserve Bank of Atlanta April 2009

11.     In July 2008, James Lockhart, Director of the Office of Federal Housing Enterprise Oversight ("OFHEO"), certified both Fannie Mae and Freddie Mac as being "adequately capitalized." Following that OFHEO certification, the Fannie Mae Board on August 8, 2008, declared a third quarter $413 million dividend on its Junior Preferred shares, payable September 30, 2008 (the "August 2008 $413 million Declared Dividend").

12.     On September 8, 2008, Director Lockhart appointed FHFA to serve as each of the Companies' Conservator, and announced cancellation of the Fannie Mae Junior Preferred August 2008 $413 million Declared Dividend's payment.

13.     Director Lockhart's announced cancellation of the Fannie Mae August 2008 $413 million Declared Dividend, if not immediately rescinded, would in time result in the Federal Government's being declared in breach of its implicit guaranty of Fannie Mae Junior Preferred payments, with attendant demand for $34 billion of Fannie/Freddie preferred share principal payment, and the August 2008 $413 million Declared Dividend payments to follow.

14.     On September 11, 2008, Treasury issued an announcement wherein it: (a) referenced the Junior Preferred shares FG Implicit Guaranty; and (b) retracted Director Lockhart's cancellation of the Fannie Mae August 2008 $413 million Declared Dividend with language as follows: *"Contracts are respected in this country as a fundamental part of rule of law"*, and *"Dividends actually declared by a GSE before the date of the senior preferred stock purchase agreement [i.e., the August 2008 $413 million Declared Dividend] will be paid on schedule"* ("Retraction").

15.     The Retraction, and Treasury mandate to the Conservator to direct Fannie Mae to pay its August 2008 $413 million Declared Dividend provides cogent evidentiary confirmation

of: (a) the Junior Preferred's enjoyment of the FG Implicit Guaranty of payment at August 2008, and (ii) the guaranty's continuance in place thereafter in undiminished vigor and validity.

16.     Beginning on August 27, 2012, and continuous to date, Defendants breached their fiduciary and contractual duties to Plaintiff by acting in near mindless complicity as each of the Companies' Boards rubber-stamped adoption of the Third Amendment.   The Conservator ("Nominal Defendant" herein) is manifestly conflicted from pursuing the Complaint against the Defendants by reason of its complicity in the orchestration of the Third Amendment's ratification and adoption, and the continuous Board directed performance in direct contravention of its HERA imposed fiduciary and contractual responsibilities.   To the extent any of the breaches alleged hereunder are derivative of Conservator's plenary duties, a demand for such exercise would be futile given the Conservator's complicity in the acts complained of.   Thus, Plaintiff brings this action, with the Conservator named as Nominal Defendant, as provided under HERA.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1452, 1455, 1717, 1719, 1723a(a) and 4617, as well as 28 U.S.C. § 1331. In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.   The Court also has subject matter jurisdiction over claims asserted herein pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of including the Defendants primary participation in the wrongful conduct described and detailed herein occurred in this district, and

Defendants have engaged to numerous activities and conducted business here which had an effect in this district.

## THE PARTIES

19.     Plaintiff, a citizen of New York owns, and holds both Freddie Mac and Fannie Mae non-cumulative perpetual Junior Preferred stock.

20.     Defendants Christopher S. Lynch, Raphael W. Bostic, Carolyn H. Byrd, Lance F. Drummond, Thomas M. Goldstein, Richard C. Hartnack, Steven W. Kohlhagen, Donald H. Layton, Sara Mathew, Saiyid T. Naqvi, Nicolas P. Retsinas, Eugene B. Shanks, and Anthony A. Williams were Freddie Mac corporate directors on August 17, 2012 with addresses unknown, other than care of Freddie Mac at 8200 Jones Branch Drive, McLean, Virginia 22102.

21.     Defendant Freddie Mac is a federally chartered, privately owned company with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia 22102.

22.     Defendants Egbert L.J. Perry, Amy E. Alvin, William T. Forrester, Brenda J. Gaines, Frederick B. Harvey III, Robert H. Herz, Timothy J. Mayopoulos, Diane C. Nordin, Jonathan Plutzik, and David H Sidwell were Fannie Mae corporate directors on August 17, 2012 with addresses unknown, other than care of Fannie Mae at 3900 Wisconsin Avenue, NW (MS 1H 2S 05) Washington, DC 20016-2892.

23.     Defendant Fannie Mae is a federally chartered, privately owned company with its principal executive offices located at 3900 Wisconsin Avenue, NW (MS 1H 2S 05), Washington, DC 20016-2892.

## FACTS

### A.     THE COMPANIES

24.     Fannie Mae, and Freddie Mac are stockholder-owned corporations organized at different time, and existing under the Federal Home Loan Mortgage Corporation Act.   Freddie

8

Mac was created as an alternative to Fannie Mae to make the secondary mortgage market more competitive and efficient, and to increase mortgage market liquidity. The Companies seek to accomplish their mission by purchasing mortgages that private banks originate and bundle into mortgage-related securities to be sold to investors worldwide. Through the creation of this secondary mortgage market, the Companies increase liquidity for private banks, which thus enables them to make additional loans to individuals for home purchases.

25.     Freddie Mac's bylaws designate the Virginia Stock Corporation Act (the "VSCA") as controlling for purposes of Freddie Mac's corporate governance practices and procedures to the extent not inconsistent with the Company's enabling legislation and other federal laws, rules and regulations. There is no federal corporate law applicable to Freddie Mac, or the corporate law issues this complain raises, other than Virginia law as so incorporated.

26.     Fannie Mae's bylaws designate Delaware General Corporation Law (the "DGCL") as controlling for purposes of Fannie Mae's corporate governance practices and procedures to the extent not inconsistent with the Company's enabling legislation and other federal laws, rules and regulations. There is no federal corporate law applicable to Fannie Mae, or the corporate law issues this Complaint raises, other than Delaware law as so incorporated.

## B.     THE JUNIOR PREFERRED SHARES, AND THE FEDERAL GOVERNMENT'S IMPLICIT GUARANTY OF GSE FINANCIAL OBLIGATIONS

27.     Before the imposition of the 2008 conservatorship, Fannie/Freddie, in the course of their operations as privately owned, for-profit entities, issued both common stock and preferred stock. Pre-conservatorship, each Company's Junior Preferred shares were federal regulatory agency accepted as "Government Securities" suitable for bank tier one capital holding (*i.e.,* risk free) investment. Before 2007, each company was consistently profitable, and prior to

1" = "1" "HF 12081560v.1" "" HF 12081560v.1

that time, had never experienced an annual loss, and regularly declared and paid dividends on their Junior Preferred stock.

28.     Despite the imposition of conservatorship in 2008, the Companies continued to have private preferred and common stockholders.  The common stock holder ownership interest of each company was, however, effectively diluted by 79.9% in connection with the 2008 adoption of SPSPA financing, and Senior Preferred stock issuance.

29.     In 2009, the GSEs, *sub silentio* were *de facto* nationalized by, *inter alia,* the Federal Government's imposition and non-reimbursement, over time, of nearly $60 billion of the Home Affordability Reference Program ("HARP") and the Home Affordable Modification Program ("HAMP") costs (the "2009 De facto Nationalization") on the Companies.  As candidly acknowledged in deposition testimony by Timothy Geithner, formerly the United States Secretary of the Treasury, ongoing GSE public ownership was a government fiction, and the Companies were from their conservatorship start "effectively nationalized."  With common shares of negligible value, in the first instance, attendant to SPSPA 79.9% *de facto* common share ownership dilution, and a share price in pennies, the Fannie/Freddie common shareholders had little incentive to challenge the Companies' nationalization in taking value contest.  In time, speculators swooped in as buyers, perhaps to fight another day in obscene profit pursuit.

30.     Under both Delaware, and Virginia law, a "Certificate of Designation" is deemed to be an amendment to a corporation's charter, and is therefore generally viewed as contractual in nature.  In addition, the corporation, its directors and its officers owe fiduciary duties to preferred stockholders and to the corporate business entity.

31.     Prior to the conservatorship, each series of Freddie Mac and Fannie Mae Junior Preferred stock ranked on a parity with all other issued and outstanding series of Junior Preferred

as to the payment of dividends and the distribution of assets upon dissolution (*i.e.,* liquidation). In other words, each series of Freddie Mac and Fannie Mae Junior Preferred stock carried equal liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or Company or windup (*i.e.,* liquidation).

32.     Prior to the creation and issuance of the Senior Preferred, Freddie Mac and Fannie Mae regularly declared and paid dividends on each series of their respective its Junior Preferred stock.

33.     The FG Implicit Guaranty of the GSEs' preferred shares was critical to the Companies being able to market and successfully sell approximately $22 billion of Junior Preferred shares as riskless Government Security perpetual capital in the period beginning late 2007 thru May 2008.

34.     Fannie Mae's ability to sell $4.8 billion of its Junior Preferred shares — less than four months prior to the Company's entry into conservatorship on September 6, 2008 — was the undoubted result of the market's acceptance and reliance on federal regulator agency non-challenge, and seeming acquiescent acceptance of Fannie/Freddie Preferred Shares being Government Securities, payment protected by FG Implicit Guaranty.[4]

## C.   THE CANCELLATION AND REINSTATEMENT FOR PAYMENT OF FANNIE MAE JUNIOR PREFERRED "AUGUST 2008 $413 MILLION DECLARED DIVIDEND"

35.     Beginning in 2007, a global financial crisis and nationwide declines in the housing market caused the GSEs to suffer significant losses.   Despite those losses, the Companies remained adequately capitalized, and, as described by Director Lockhart, "safe and sound."

---

[4] The implicit Federal Government guaranty of GSE Financial Obligations is examined in detail in Plaintiff's February, 2016 study, entitled, Government Perfidy and Mismanagement of the GSEs In Conservatorship ("Perfidy") attached hereto as Exhibit "A".

36.     In July 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), and therein created the FHFA to replace OFHEO as the GSEs regulator.  HERA, authorized FHFA to appoint an independent person, or FHFA itself, as the GSEs conservator, or receiver of the GSEs in statutorily specified circumstances.  For reasons known only to itself, FHFA chose to appoint itself rather than an independent person as Fannie/Freddie Conservator.

37.     The self-appointment of the FHFA Regulator as Fannie/Freddie Conservator independently added the traditional trustee fiduciary responsibilities of a conservator onto the FHFA in addition to, and separate and apart from, the Conservator's HERA mandated responsibilities.

38.     HERA left in place the Companies' federal charters and the FG Implicit Guaranty of their Financial Obligations.  HERA did not alter the provisions of the Companies respective bylaws implemented pursuant to federal law and, with regard to Freddie Mac, that Virginia law apply for Freddie Mac corporate governance purposes.  HERA also did not abrogate the basic contractual and fiduciary duties owed by the Conservator, and the Defendants, to holders of Freddie Mac and Fannie Mae financial obligations in similar scope under federal and state insolvency laws.

39.     HERA was passed, not because Fannie/Freddie were deemed to be then insolvent, or operating unsafely, but rather to provide the struggling mortgage and financial markets with added confidence in the GSEs improved liquidity.  Less than two months after HERA's passage, and Director Lockhart's public declaration of the GSEs being adequately capitalized, the companies were placed under FHFA-directed conservatorship, as the FHFA Regulator appointed itself as GSEs Conservator, and announced as its goal the return of the GSEs to normal business operations.

1" = "1" "HF 12081560v.1" "" HF 12081560v.1

40.     When the FHFA Regulator's self-appointment as Conservator was announced, the FHFA Regulator and Conservator jointly announced a goal to return the GSEs to normal business operations, which once restored to a safe and solvent condition would be terminate the conservatorship.

41.     That announcement was consistent with the HERA mandate for the Conservator once named to "take such actions as may be":

> (i) necessary to **put the regulated entity in a sound and solvent condition**; and
>
> (ii) appropriate to **carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity**.

(Emphasis Supplied).

42.     At no time did that express HERA mandate, for the FHFA Regulator and Conservator to "preserve and conserve" the GSEs' assets, change.  In a deposition taken under oath on May 7, 2015, Edward DeMarco, Director of the FHFA Regulator, and as and the GSEs Conservator testified that:

> My commitment was to ensure that the conservatorship carried out its function and responsibility so these two companies were **capable of continuing to operate in a sound and solvent condition** so the United States of America had a functioning secondary mortgage market . . . (Emphasis Supplied).
>
> ***
>
> It was important to me to **keep these companies functioning in a sound and solvent way**. . . (Emphasis Supplied).

43.     On September 6, 2008, FHFA placed the Companies into conservatorship and the next day, FHFA Director Lockhart said:

> "...*in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and*

> *all preferred stocks will continue to remain outstanding.  Subordinated*
> *debt interest and principal payments will continue to be made."*

44.     Director Lockhart's cancellation of the August 2008 $413 million Declared Dividend, if not immediately retracted and rescinded, would in time result in the Federal Government being declared in breach of its implicit guaranty of GSEs Junior Preferred capital payments, and likely near concurrent demand for $34 billion of par principal, and $413 million of Dividend payments.

45.     Despite entering into Conservatorship, the Fannie/Freddie Boards retained (or were empowered with) certain duties and obligations, and although HERA empowered FHFA to place Fannie/Freddie into conservatorship, and assume direct plenary management as Conservator, HERA left in place the Companies' federal charters, and did not otherwise alter the provisions of bylaws, implemented pursuant to federal law, as they continued to have private preferred and common stockholders.

46.     As Secretary Paulson himself noted, the entry into conservatorship did **not** eliminate the outstanding Junior Preferred shares.  To wit:

> Similarly, conservatorship does not eliminate the outstanding
> preferred stock, but does place preferred shareholders second, after
> the common shareholders, in absorbing losses.

47.     Similarly, HERA did not change the fact that VSCA would apply to Freddie Mac in its corporate governance.

48.     Pursuant to its powers under HERA, the Conservator reconstituted Freddie Mac and Fannie Mae's respective Board, as it concurrently delegated certain day to day plenary authority such as share <u>dividend declaration</u> back to the Board.

49.     In appointing directors to the Freddie Mac Board, the Conservator made clear that while the Directors' remained responsible for carrying out normal board functions, they were

required to, *inter alia*, obtain FHFA's review and approval before taking action in certain areas, including, *inter alia*, the "declaration or payment of dividends or any other distribution" to the Company's shareholders, with distinction only with regard to priority in payment, and otherwise in pari par su contractual and fiduciary entitlement.

50.     The Defendants' continuing powers and obligations in Fannie Mae's day to day business operations have been well accepted in that Company's ten year conservatorship.  For example, on February 18, 2016, Fannie Mae stated that it "continue[s] to operate as [a] business corporation[] with [a] board[] of directors subject to corporate governance standards stating that its board of directors was responsible - like boards of directors at other companies - for overseeing its business activities;  and "effectively running the company".

51.     HERA, *however, did not provide license to either the FHFA Regulator, the Conservator, or the Freddie Mac or Fannie Mae Boards to disregard direct non-operational corporate governance, contractual, and fiduciary obligations owed to Freddie Mac and Fannie Mae's respective shareholders under VSCA law, and the Companies' preferred share Certificates of Designations.*

52.     Moreover, both Fannie Mae and Freddie Mac  post conservatorship adopted Codes of Conduct and Conflicts of Interest Policies ("Code of Conduct") for the members of their respective Boards of Directors providing, in pertinent part:

A.     **Conflicts of Interest**

\*\*\*

3.     Directors must not engage in any conduct or activity that is inconsistent with the Corporation's best interests, as defined by the Conservator's express directions, its policies and applicable federal law, or that disrupts or impairs the Corporation's relationship with any person or entity with which the Corporation has or proposes to enter into a business or contractual relationship.

1" = "1" "HF 12081560v.1" "" HF 12081560v.1

***

### D.  Fair Dealing

Directors should endeavor to deal fairly with the Corporation's customers, suppliers, competitors and employees.  Directors should not take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of material facts or any other unfair-dealing practice.

### E.  Protection and proper use of Corporation assets

Directors shall oversee the protection of the Corporation's assets and their efficient use.  The Corporation's assets include not only tangible items but also intellectual property (such as ideas, inventions, trade secrets, copyrighted material and trademarked materials).  Theft, carelessness and waste have a direct negative impact on the Corporation's interests.  Corporation assets should be used for legitimate business purposes.

***

### F.  Compliance with laws, rules and regulations

Directors shall comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Corporation.  The Corporation is a Government-Sponsored Enterprise and, thus, is subject to special statutory and regulatory provisions.  In addition, for as long as the Corporation remains under the Conservatorship, the Corporation shall be subject to the directions and policies of the Conservator and to certain statutory and regulatory provisions applicable to the Conservatorship.  These provisions, directions and policies encompass interactions between the Corporation's directors, officers and employees and the Conservator and any other governmental entities, congressional staff or regulatory personnel of entities with jurisdiction over any aspect of the Corporations' business.

53.  Simply put, the Conservator and Defendants owed (and continue to owe) certain fiduciary obligations to the Companies' equity owners despite the Companies having been placed into conservatorship.  Serving two masters (*i.e.,* Conservator, and equity owners), Defendants needed to comport themselves in accordance with (a) the Federal Government rules, regulations and statutes applicable to the conservatorship — including the mandate under HERA Section 4617(b)(2)(D) to put the Companies in "a sound and solvent condition", "carry on the business" of the Companies, and "preserve and conserve their assets and property"; while at the

16

same time serving in strict compliance with the Code of Conduct, <u>and</u> (b) VSCA mandated practices and procedures for its corporate citizens to the extent not inconsistent with the HERA enabling legislation, and other federal rules, regulations, and statutory laws.

**D.     FANNIE/FREDDIE SENIOR PREFERRED STOCK**

54.     The day after the GSEs were placed into conservatorship, Treasury exercised its temporary authority under HERA and entered into nearly identical SPSPAs with each of them. The SPSPAs provided for Treasury to purchase a newly created series of preferred shares (the "Senior Preferred") <u>with a then agreed to</u> 10% dividend coupon.

55.     *The SPSPA required Freddie Mac and Fannie Mae to obtain Treasury permission before declaring and paying dividends on its junior preferred shares. It did not, however, otherwise eliminate the Companies' governance and contractual obligations with regard to such payment. In return for Treasury's commitment to purchase $100 billion of Freddie Mac and Fannie Mae Senior Preferred Stock, Treasury received $1 billion of Senior Preferred Stock in each of the Companies together with warrants to acquire 79.9% of each Company's common stock at a nominal price in ownership by warrant effective dilution. Treasury also established a $100 billion lending facility for each Company, later increased by two subsequent SPSPA amendments to $200 billion.*

56.     *Notably, the SPSPA required the Directors of the Companies to apply their own discretion before declaring, and paying dividends on, Senior Preferred Stock. In fact, the Certificate of Designation of Terms Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 (the "Senior Preferred Stock Certificate") expressly provides that a dividend and/or distribution will only be issued "when, as, and if declared by the Board of Directors in its sole discretion".*

17

57.     Neither the SPSPA nor the Senior Preferred Certificate of Designation otherwise eliminate or materially alter the Defendants governance and contractual duties under federal or state law, or their generally accepted definition as being federal government Financial Obligations.

58.     Among other things, Defendants knew prior to August 17, 2012   - upon information and belief - that many of FHFA's early write-downs, including valuation allowances for deferred tax assets, would soon be reversed as the GSEs were inexorably about to generate massive profits.

59.     Fannie Mae's former chief financial officer, Susan McFarland, told officials at the Treasury on or about August 9, 2012, that the company was "now in a sustainable profitability, that we would be able to deliver sustainable profits over time."

60.     Ms. McFarland's words were prescient.  As both, Fannie Mae and Freddie Mac began to experience a vigorous recovery, in their profitability, earning profits of $7.8 billion and $3.5 billion, respectively, in the first half of 2012 alone.

61.     Upon information and belief, Defendants knew prior to August 17, 2012, that GSEs massive profits would require the resumption of good faith Board decisions with regard to dividend declaration, and payment.

62.     With Fannie/Freddie both having returned to huge profitability, the public had reason to believe that the Companies would eventually be healthy enough to require a good faith return "to normal business operations," as (i) the FHFA Regulator and Conservator had vowed when the conservatorships were established.  Unfortunately, the Federal Government, on or about July 2012 determined to indulge itself on the Companies' profit recovery, by, *inter alia,* over time converting, $10 billion of Junior Preferred dividend entitlement payments to Treasury.

To achieve the conversion Treasury, the FHFA Regulator and the Conservator combined in a Federal Government Third Amendment feeding frenzy and directed Defendants' near mindless acquiescence in accepting and amending Fannie/Freddie Senior Preferred Certificates of Designation "Dividend Amount". The Third Amendment language ensured that Treasury would thereafter receive the entire positive net worth of each of the Companies' quarter by quarter in perpetuity (*i.e.,* the Net Worth Sweep).

63.     GSEs Senior Preferred corresponding Certificates of Designation were then amended, in pertinent part, as follows:

> . . . For each Dividend Period from January 1, 2013, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, *cumulative* cash dividends in an amount equal to the then-current Dividend Amount.
>
> * * *
>
> For each Dividend Period from January 1, 2013, through- and including December 31, 2017, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end- of the immediately preceding fiscal quarter, less the Applicable Capital Reserve Amount, exceeds zero. *For each Dividend Period from January 1, 2018,-the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter exceeds zero.* In each case, "Net Worth Amount" means (i) the total assets of the Company (such assets excluding the Commitment and any unfunded amounts thereof)-as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP, less (ii) the total liabilities of the Company (such liabilities excluding any obligation in respect of any capital stock of -the Company, including this Certificate), as reflected on the -balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP. "Applicable Capital Reserve Amount" means, as of any date of determination, for each Dividend Period from January 1, 2013, through and including December 31, 2013, $3,000,000,000; and for each Dividend Period occurring within each 12-month period thereafter,

$3,000,000,000 reduced by an equal amount for each such 12-month period through and including December 31, 2017, so that for each Dividend Period from January 1, 2018, the Applicable Capital Reserve Amount shall be zero. For the avoidance of doubt, if the calculation of the Dividend Amount for a Dividend Period does not exceed zero, then no Dividend Amount shall accrue or be payable for such Dividend Period.

(Emphasis Supplied).

64.     No consideration was paid to Freddie Mac or its Junior Preferred Shareholders in exchange for the Third Amendment Net Worth sweep.    As set forth above, the Third Amendment required the GSEs pay Treasury a purported "dividend" equal to the Company's "Net Worth Amount" (*i.e.,* total assets less total liabilities) less the then "Applicable Reserve Amount" (*i.e.,* $3 billion at September 2008 and decreasing to $0 by December 31, 2017).

65.     The Conservator directed, Defendants agreed to, and Auditor ratified, the continued placement on Fannie/Freddie certified balance sheets, of the Applicable Capital Reserve Amount below, both Senior Preferred, and Junior Preferred on both Companies' post conservatorship balance sheets.    That placement is strongly evident of (a) the FG Implicit Guaranty of Junior Preferred share payments extent; and ongoing validity, and (b) the Junior Preferred as permanent capital entitled to 100% par repayment in either GSE liquidation, or restoration post conservatorship and (c) Junior Preferred shares' liquidation value of 100%.

66.     Beginning January 1, 2013 and continuing in perpetuity, the Net Worth Amount would - with Defendants' approval - be paid out each quarter to Treasury without any capital reserve buffer whatsoever.

67.     Net Worth Sweep "dividends" are cumulative, and thus, if the Net Worth Amount is greater than zero, and the Boards do not declare a "dividend" on the Senior Preferred stock, the "dividend" then accumulates.

68.     Under Senior Preferred Certificates of Designation, no dividends may ever be paid on any other classes or series of stock of the Companies unless and until full cumulative "dividends" (*i.e.,* the full Net Worth Sweep amount) are paid on the Senior Preferred stock pursuant to the Net Worth Sweep.  With the entire net worth of the Companies payable in perpetuity to the Senior Preferred Stock, and the Applicable Capital Reserve Amount scheduled to reduce to $0 on December 31, 2017 there would, (as history has confirmed), be no remaining assets from which dividends could ever be paid on Plaintiff's Fannie/Freddie Junior Preferred shares.

**E.     THE NET WORTH SWEEP**

69.     Both Fannie Mae and Freddie Mac returned to profitability in 2012.  That year, Freddie Mac for example earned $11 billion in profits inclusive of $1.5 billion of restored deferred income tax benefits.  Both Companies with aggressive accounting loss reserve reversals became even more profitable in 2013 ($51.6 billion inclusive of $23.3 billion or restored deferred income tax benefits), and they have remained consistently, and enormously profitable to date thereafter.

70.     An August 17, 2012 email exchange among Treasury/Obama Administration officials Jim Parrott, Timothy Bowler, Mary Miller, Robert Miller, Mary Goodman, Frederic Ryser, Daniel Gish, Randy Masel, Simon Park, Eugene Burger, Richard Labriola, and Dylan Minert made concurrently with Treasury's Net Worth Sweep announcement is in *prima facie* evidence of the Treasury Conservator's, FHFA Regulator's, bad faith in directing the Defendants' Third Amendment's adoption as follows: "The principle of 'full income sweep of all future earnings to benefit taxpayers' should lay to rest permanently the idea that the outstanding privately held pref. will ever get turned back on". [Emphasis Supplied].

1" = "1" "HF 12081560v.1" "" HF 12081560v.1

71.     Having, as Secretary Geithner admitted under oath, "effectively nationalized the GSEs" from the conservatorship start, the Federal Government to date has exhibited little inclination to pay Fannie Mae, Freddie Mac or their equity owners for what was taken in 2009 as $60 billion of non-reimbursed HARP/HAMP costs were then off-loaded on the Companies.

72.     Thus, the Net Worth Sweep is best viewed as being a mere extension of GSEs 2009 de facto Nationalization with once again the Federal Government's need to pay for taking extending solely to what was then taken, and not for what was thereafter fortuitously garnered in the second GSEs Nationalization, to wit, Junior Preferred dividend entitlement.

73.     In February 2011, Treasury issued a white paper in which it set forth three basic ideas for Federal Government actions, to be taken in concert over time, to reduce and limit the GSEs' dominant mortgage market role, with the final purpose being to "ultimately wind down" (*i.e.,* liquidate Fannie and Freddie) (the "White Paper").

74.     For GSEs' common share owners the Net Worth Sweep constituted a second (*i.e.,* after HARP/HAMP) per se de facto nationalization event, and  uncompensated taking under the Fifth Amendment of the U.S. Constitution.

75.     *For GSEs Junior Preferred Shareholders the Net Worth Sweep while initially in anticipatory breach of Junior Preferred contractual dividend entitlement and de facto nationalized Junior Preferred value taking, over time became absolute in its taking through the dividend entitlement breach, and otherwise was no more of an event for GSE Junior Preferred Shareholders than it was for the GSE debt holders, with both GSE debt and Junior Preferred equity owners operating under the same protection of payment afforded by the FG Implicit Guaranty of payment.*

76.     *Between December 31, 2008, and December 31, 2017 both Fannie/Freddie year end audited certified balance sheets have consistently reflected $34 billion of Junior Preferred par value (i.e., Fannie Mae $19.13 billion; Freddie Mac $14.1 billion) in tandem placement immediately below the (senior in payment) Senior Preferred, and ABOVE the then Applicable Capital Reserve Amount.  From December 31, 2008 to December 31, 2017, the $34 billion Fannie/Freddie Junior Preferred par value redemption payment amount has been 10 year auditor verified and listed as permanent "capital "(pre-conservatorship), and beginning year end 2009 as commitments and contingencies payables" just below Senior Preferred in wait and see for the Federal Government to announce its conservatorship end game of with either liquidation payment in full, or restored status as permanent (i.e., dividend paying) Senior (i.e., to common) capital.*

77.     *Other than the Senior Preferred's status as senior in priority of payment, the Fannie/Freddie audited balance sheets reflect auditor verification of (a) the only meaningful difference in liquidation or other GSEs conservatorship ending between the Senior Preferred issue being priority in order of payment and (b) sufficient Fannie/Freddie equity value to pay both Senior Preferred and Junior Preferred 100% in full as either conservatorship ending, dividend paying permanent capital or par liquidation value.*

## F.     THE NET WORTH SWEEP WAS IN BREACH OF JUNIOR PREFERRED ENTITLEMENT TO RECEIVE DIVIDEND PAYMENTS.

78.     The 2008 imposition of conservatorship, and SPSPA financing, merely <u>suspended</u>, but did not abolish the Fannie/Freddie Boards' ability to declare, and pay Junior Preferred dividends to equity owners.

79.     The Net Worth Sweep triggered a dividend payment breach because it eliminated the Companies' ability to build capital, and in so doing effectively nullified, and eliminated the Board's exercise of its contractual dividend declaration functions.

80.     The Net Worth Sweep which *sub silentio* altered, and illegally nullified, and eliminated Board dividend declaration function was in violation of the SPSPA and VSCA. Defendants' mindless agreement to the Net Worth Sweep allowed Treasury to expropriate approximately $10 billion (*i.e.,* Freddie Mac $5.8 billion; Fannie Mae $4.2 billion) of Junior Preferred dividend receipt entitlement.

81.     In addition to their explicit terms, inherent in the Certificate of Designation governing each series of Fannie/Freddie preferred stock is an implied covenant of the Defendants to-deal fairly with the respective holders of every class of their preferred stock (*i.e.,* Junior Preferred, and Senior Preferred), and to fulfill the issuers' contractual obligations, and the stockholders' reasonable contractual good faith expectations, *e.g.,* an implied promise that the Companies would not take actions that would make it impossible for the holders of their preferred stock to realize any value from their dividend and liquidation rights. In near mindless adoption, ratification, and performance of the Third Amendment the Defendants both acted unfairly, and in bad faith with respect to the Plaintiff, as they breached each Company's implied covenant of good faith and fair dealing in grossly negligent Net Worth Sweep agreement acquiescence. Defendants' conduct made it impossible for the holders of each Company's Junior Preferred to realize value from their share contractual dividend entitlement rights, and in so doing denied Plaintiff the fruits of his agreement with both Fannie Mae, and Freddie Mac, respectively.

1" = "1" "HF 12081560v.1" "" HF 12081560v.1

## G.   DEFENDANTS VIOLATED THEIR FIDUCIARY DUTIES TO PLAINTIFF BY ENTERING INTO THE THIRD AMENDMENT.

82.     Federal law obligates both Fannie Mae and Freddie Mac to designate a body of law elected for its corporate governance practices and procedures, to the extent not inconsistent with its federal charter and other federal law, rules, and regulations.  Freddie Mac designated the corporate law of the Commonwealth of Virginia while Fannie Mae designated the corporate law of Delaware for that purpose.  Pursuant to federal law incorporating Virginia law, or Delaware law as applicable, the officers and directors of each Company owe fiduciary duties of due care and loyalty to both the Companies and their equity owners.

83.     The Net Worth Sweep offered no benefits whatsoever to the Company or its Junior Preferred Shareholders.  Rather, it was an egregiously unfair and blatantly illegal conversion, by effecting the Third Amendment, of nearly $10 billion (*i.e.,* Freddie Mac $5.8 billion approximately, Fannie Mae $4.2 billion approximately) of Plaintiff's dividend entitlement.

84.     The Defendants' aid, abettance and Third Amendment acceptance actions were in conflict of interest, and breach, *inter alia,* of the Defendants' duty of loyalty, duty of care, and duty of utmost good faith owed to Plaintiff.

## H.   DEFENDANTS VIOLATED THEIR FIDUCIARY DUTIES TO PLAINTIFF BY AIDING AND ABETTING FEDERAL GOVERNMENT AVOIDANCE IMPLICIT GURANTY OF GSE SECURITIES PAYMENT AVOIDANCE

85.     Regarding the GSE's September 6, 2008 entry into conservatorship and execution of the SPSPA's, Treasury Secretary Paulson on September 7, 2008 referenced the Government's implicit guaranty of GSEs debt obligations, and Treasury's SPSPA Agreements with the GSEs in a public announcement (the "Paulson Announcement"), stating as follows:

> "These Preferred Stock Purchase Agreements (*i.e.,* SPSPAs) were made necessary by the ambiguities in the GSE Congressional

charters, which have been perceived to indicate government support for agency debt and guaranteed MBS. Our nation has tolerated these ambiguities for too long, and as a result GSE debt and MBS are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free. Because the U.S. Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now powered by the sale and breadth of the holdings of GSE debt and MBS.

86.    Secretary Paulson did not directly address the GSEs preferred share's implicit guaranty of payment stating only:

"Similarly, conservatorship does not eliminate the outstanding preferred stock, but *does place preferred shareholders second, after the common shareholders, in absorbing losses.*" [Emphasis Supplied]

- And -

"The federal banking agencies are assessing the exposures of banks and thrifts to Fannie Mae and Freddie Mac. The agencies believe that, while many institutions held common or preferred shares of these two GSEs, only a limited number of smaller institutions have holdings that are significant compared to their capital.

87.    Immediately following Secretary Paulson's September 7th statement, FHFA Director Lockhart made the following announcement:

". . . in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding. Subordinated debt interest and principal payments will continue to be made."

88.    Financial markets interpreted the September 7, 2008 announcements by Secretary Paulson and Director Lockhart to be a rejection and repudiation of the federal government's implicit guaranty of GSE's preferred shares payment, and at the Monday morning market opening GSEs preferred share prices collapsed from their Friday close.

89.     Aside from Secretary Paulson's high minded ethical, and correct statements of October 8, 2008, (cited above), and Treasury September 11, 2008 $413 million Declared Dividend retraction and accompanied language of; "*Contracts are respected in this country as a fundamental part of the rule of law*" (cited above) Federal Governments expressions on the subject have been disappointingly silent.

90.     *On December 21, 2017 the FHFA Regulator, and the Treasury agreed to reinstate the $3 billon Applicable Capital Reserve Amount for each of the GSEs. in status quo ante return to the SPSPA's Applicable Capital Reserve Amount initially set in 2008.*

91.     In a letter agreement (attached hereto as Exhibit B, the "Letter Agreement") each of the GSEs, Treasury, and the Conservator agreed to change the terms of the SPSPA, Third Amendment so as to permit Fannie/Freddie to each retain a $3 billion capital reserve each quarter stating:

> "As a result of these agreements each GSE will only pay a dividend to Treasury if the net worth at the end of a quarter is more than $3 billion.  The terms as described, apply to any quarterly dividend paid for the fourth quarter of 2017 and each quarter thereafter."

92.     FHFA Regulator Director Watt independently issued a statement regarding the change stating:

> "While it is apparent that a draw will be necessary for each Enterprise if tax legislation results in a reduction to the corporate tax rate FHFA [Regulator] considers the $3 billion capital reserve to be adequate in the absence of exigent circumstances".

93.     The Letter Agreement amended the SPSPA Senior Preferred Certificate of Designation so that effective January 1, 2018 the SPSPA "Applicable Capital Reserve Amount" was changed to read as follows:

> (c) For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31,

2012, "dividend Rate" means 10.0 percent; provided, however, that if at any time the Company shall have for any reason immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) the "Dividend Rate" shall mean 12.0 percent.

For each Dividend Period from January 1, 2013, and thereafter, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter, less the Applicable Capital Reserve Amount for such Dividend Period, exceeds zero.  In each case, "Net Worth Amount" means (i) the total assets of the Company (such assets excluding the Commitment and any unfunded amounts thereof) as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP, less (ii) the total liabilities of the Company (such liabilities excluding any obligation in respect of any capital stock of the Company, including this Certificate), as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP.

"Applicable Capital Reserve Amount" means, as of any date of determination, (A) for each Dividend Period from January 1, 2013, through and including December 31, 2013, $3,000,000,000; (B) for each Dividend Period occurring within each 12-month period thereafter, through and including December 31, 2017, $3,000,000,000 reduced by $600,000,000 for each such 12-month period, so that for each Dividend Period from January 1, 2017, through and including December 31, 2017, the Applicable Capital Reserve Amount shall be $600,000,000; and (C) for each Dividend Period from January 1, 2018, and thereafter, $3,000,000,000. Notwithstanding the foregoing, for each Dividend Period from January 1, 2018, and thereafter, following any Dividend Payment Date with respect to which the Board of Directors does not declare and pay a dividend or declares and pays a dividend in an amount less than the Dividend Amount, the Applicable Capital Reserve Amount shall thereafter be zero.  For the avoidance of doubt, if the calculation of the Dividend Amount for a Dividend Period does not exceed zero, then no Dividend Amount shall accrue or be payable for such Dividend Period.

For the avoidance of doubt, following the amendment of the Certificate as provided in this Letter Agreement, Section 2 of the Certificate, as amended hereby, shall be deemed to be in form and

content substantially the same as the form and content of the Senior Preferred Stock in effect on September 30, 2012. [Emphasis Supplied]"

94.     Defendants violated their fiduciary Duties to Plaintiff as a Fannie Mae, and Freddie Mac Junior Preferred equity owner by aiding and abetting the government in payment avoidance of the FG Implicit Guaranty of Junior Preferred dividend payment.

## I.     THE CASE TO DATE, AND RECENT EVENTS OF NOTE

95.     On March 1, 2016, Plaintiff sent a letter, with copy of Perfidy attached to both of the Companies, and their respective Boards urging their members to start behaving as responsible Board members in the exercise of their duty to, *inter alia,* protect the property and other interests of the Companies, and their equity owners.  Receiving no response, Plaintiff on April 19, 2016 sent a second letter, with a draft complaint ("Draft Complaint") attached, to the Boards (the "Second Letter").

96.     Receiving no response to the Second Letter, Plaintiff was persuaded to not file the Draft Complaint, until the myriad of Third Amendment Constitutional Challenges (the "Constitutional Cases") were finally disposed of.  On February 20, 2018 the Supreme Court declined to hear the Constitutional Cases, and Plaintiff determined to revise, and file the Draft Complaint in this amended form (*i.e.*, once again this "Complaint").

97.     On May 20, 2014 Director Mel Watt in prepared remarks to the Bipartisan Policy Center stated that the most serious future risks facing the GSEs was their "lack of capital."  He noted that by January 1, 2018 the GSEs would have no capital buffers by virtue of the Net Profit Sweep, and the SPSPA's sunset funding provisions having pinpointed the GSEs capitalization problems Director Watt then committed himself to rebuilding the GSEs net capital.

98.     Shortly after Secretary Mnuchin nomination to be the Treasury Secretary Mr. Mnuchin was quoted as saying, "We've got to get Fannie and Freddie out of government

ownership".  More recently (*i.e.,* January 30, 2018 he was quoted by the Washington Examiner as follows:

> "Mnuchin told lawmakers at a Senate Banking Committee hearing that his "strong preference" would be for Congress to overhaul the two government sponsored enterprises through bipartisan legislation. <u>But he</u> also noted that the Trump administration could act if Congress does not", and "There are certain administration options that we have".  Mnuchin declined to specify what those alternatives might be though, saying that his comments could rile markets".  [Emphasis Supplied]

99.     Recognizing the Congressional GSE and conservatorship may be long in coming, one of the largest participants in the mortgage backed securities market (*i.e.,* Pimco) in February 2018 published its position on Fannie/Freddie reformation in a study entitled, in part, "Why Fix What Isn't Broken?"  To that, Plaintiff adds that the Letter Agreement having rendered all of the previous Third Amendment court tests, other than those in the Court of Claims, moot and irrelevant, Treasury should not wait for Congress to act to resolve the Junior Preferred dividend issue.  It should do so now, and in so doing, free the interminable GSE reformation debate from the rhetoric of Junior Preferred, and common equity owner Fifth Amendment taking compensation, and Third Amendment redress entitlement out of the reformation date.

## CAUSES OF ACTION

### COUNT I
### BREACH OF FANNIE MAE AND FREDDIE MAC  CONTRACTUAL DIVIDEND PAYMENTS

100.     Plaintiff incorporates by reference and reallege each and every allegation set forth in this Complaint, as though fully set forth herein.

101.     Pursuant to its enabling legislation, and its bylaws, Freddie Mac has designated that the VSCA controls for purposes of its corporate governance practices and procedures, and

Fannie Mae has designated that the DGCL controls for purposes of its corporate governance practices, and procedures.

102.   The Certificates of Designation for the Fannie Mae and Freddie Mac preferred stock respectively were and are, for all purposes relevant hereto, contracts between the Plaintiff and the Companies.

103.   Pursuant to 12 U.S.C. § 1467(b)(2), FHFA, as conservator of each Company, succeeded to the plenary management ". . . rights, powers, and privileges" of the respective Company, and its stockholders, including the Plaintiff.

104.   The certificates of designation for both Fannie Mae, and Freddie Mac preferred stock provide for contractually specified dividend rights, liquidation preferences, and voting and consent rights with respect to amendments to the terms of their respective preferred stock issues.

105.   As a Junior Preferred Shareholders of both Companies, Plaintiff enjoys certain contractual rights including but not limited to contractually specified, non-cumulative dividend payments.

106.   The Third Amendment Net Worth sweep was an act of Fannie Mae, and Freddie Mac respectively Junior Preferred dividend receipt entitlement taking.

107.   **The Third Amendment was, equally irrelevant to Plaintiff as a holder of Freddie/Fannie Junior Preferred, as it was to the holders of the Companies debt securities by reason, inter alia, of the FG Implicit Guaranty.**

108.   By entering into the Net Worth Sweep, and thereafter causing the Companies to operate, and otherwise perform in accord with its provisions by declaring and paying dividends to Treasury as Senior Preferred Stockholder in excess of 10%, the Defendants breached the Companies obligations to Plaintiff to receive dividends on his Junior Preferred shares.

1" = "1" "HF 12081560v.1" "" HF 12081560v.1

109.     The Net Worth Sweep stripped the Company of its ability to generate and retain funds to pay dividends to holders of Fannie Mae and Freddie Mac Junior Preferred shares.

110.     By expropriating the entirety of the Company's net worth, the Net Worth Sweep rendered a nullity the contractual right of the Plaintiff to receive dividend payments covered by the FG Implicit Guaranty of payment.

111.     Fannie Mae and Freddie Mac are contractually prohibited from unilaterally changing the terms of its Junior Preferred Certificate of Designation so as to materially and adversely affect the rights of one class of Preferred Stockholders in favor of another.  The Net Worth Sweep violates this prohibition by effectively making Plaintiff's Fannie/Freddie Junior Preferred share dividend payments impossible.

112.     No provision of either Fannie Mae, or Freddie Mac Junior Preferred Certificate of Designation, or other contracts reserves to Freddie Mac or the Conservator any right to ***repudiate or nullify*** the Companies' federal government implicitly guaranteed contractual dividend payment obligations to Plaintiff as a Junior Preferred Shareholder.

113.     Defendants breached the Company's contracts with the Plaintiff by aiding, abetting, and directing the Companies in their near mindless Third Amendment adoption and execution performance.

114.     Plaintiff has suffered damages far in excess of $75,000, plus interest, as a direct and proximate result of the Defendants' foregoing breach of their contractual, and fiduciary duties and obligations.

## COUNT II
## BREACH OF IMPLIED COVENANTS OF GOOD FAITH AND FAIR DEALING

115.   Plaintiff incorporates by reference and reallege each and every allegation set forth in this Complaint, as though fully set forth herein.

116.   As alleged in Count I, the Net Worth Sweep violates respective provisions of the DCGL, and the VSCA, which for all purposes relevant hereto, is a contract between the Plaintiff and Fannie Mae, and Freddie Mac as applicable.

117.   The Certificates of Designation for Fannie Mae, and Freddie Mac Junior Preferred Shareholders were and are, for all purposes relevant hereto, contracts between the Plaintiff and the Companies.

118.   Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring the Defendants to deal fairly with Plaintiff and the other holders of their Junior Preferred shares to fulfill their obligations to, and the reasonable contractual expectations of, Plaintiff in good faith, and not to deprive Plaintiff of the fruits of his share ownership bargain.

119.   Defendants were obligated to act consistently with Fannie Mae, and Freddie Mac's responsibilities under their respective Certificates of Designation governing their Junior Preferred and Senior Preferred stock.

120.   By entering into the Net Worth Sweep, and operating in compliance with its terms the Defendants effectively deprived Plaintiff of any possibility of ever again receiving dividends, and thus breached the implied covenant of good faith and fair dealing inherent in the Certificates of Designation for the Fannie Mae, and Freddie Mac Junior Preferred stock.

121.   Through the implied covenant of good faith and fair dealing, Freddie Mac was prohibited from eliminating the rights and interests of the Junior Preferred Shareholders, including Plaintiff, with respect to dividends and their liquidation preferences.   In effectively

eliminating such rights and interests entirely through the Net Worth Sweep, the Defendants acted arbitrarily and unreasonably and not in good faith or with fair dealing toward the respective to Plaintiff, and the Defendants' acts arbitrarily and unreasonably deprived Plaintiff of his reasonable contractual expectations and the fruits of his share ownership.

122.    Plaintiff suffered well in excess of $75,000 in damages, plus interest, as a direct and proximate result of the Defendants' foregoing breach of the Junior Preferred Shares implied covenant of good faith and fair dealing.

## COUNT THREE
### AIDING AND ABETTING IN FEDERAL GOVERNMENT'S IMPLICIT GUARANTY EVASION AND PAYMENT AVOIDANCE

123.    Plaintiff incorporates by reference and reallege each and every allegation set forth in this Complaint, as though fully set forth herein.

124.    By complicit agreement to the Third Amendment expropriation of the entirety of the Companies' profits, and mindless rubber stamp of its performance between January 1, 2013 and December 31, 2018 Defendants rendered the respective contractual rights of the Plaintiff as a Junior Preferred Shareholder of Freddie Mac and Fannie Mae to receive dividend payments from the Companies a nullity, and in so doing aided and abetted the federal government in avoiding $10 billion of its implicit guaranty of such payments.

125.    The Plaintiff suffered far in excess of $75,000, plus interest as a direct and proximate result of the Defendants' actions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Declaring that Defendants breached the terms of the Certificates of Designation governing Fannie Mae's and Freddie Mac's Junior Preferred stocks;

B.      Declaring that Defendants breached the implied covenant of good faith and fair dealing inherent in the Certificates of Designation governing the Fannie Mae, and Freddie Mac Junior Preferred stock;

C.      Awarding compensatory damages in favor of Plaintiff and against the Defendants for breach of Plaintiff's contractual rights for dividends, with interest thereon from the respective missed dividend payment dates.

D.      Awarding in compensatory damages in favor of Plaintiff and against the Defendants for breaches of the Company's Certificates of Designation and the implied covenant of good faith and fair dealing, including interest thereon from the respective missed dividend payment dates;

E.      Awarding compensatory damages in favor of Plaintiff for Aiding and Abetting the Federal Government in avoiding payment on its implicit guaranty of Junior Preferred dividends, with interest thereon from the respective missed dividend payment dates.

F.      Awarding Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.      Such other and further relief as the Court may deem just and proper.

Dated:    May 18, 2018

_____
Joshua J. Angel
2 Park Avenue
New York, New York 10017
(917) 714-0409
joshuaangelnyc@gmail.com

*Pro Se Plaintiff*

## **VERIFICATION**

Joshua J. Angel hereby verify that I am the pro-se Plaintiff, and I have authorized the filing of the attached complaint (the "Complaint"), that I have reviewed the Complaint, and that the facts therein are true and correct to the best of knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE:  May 18, 2018

_____
Joshua J. Angel
2 Park Avenue
New York, NY 10017
(917) 714-0409

# EXHIBIT A

# Government Perfidy

# and Mismanagement of

# the GSEs in Conservatorship

## Josh Angel

HF 10598648v.1

# PART ONE

# Perfidy

## I. <u>Introduction</u>

In September 2008, the government-sponsored enterprises (GSEs) Fannie Mae and Freddie Mac were directed into government-controlled conservatorship by the U.S. Treasury and the Federal Housing Finance Administration (FHFA). With identical missions at inception—to support liquidity and stability in secondary mortgage markets—the GSEs continued to function perfectly in that capacity after being relegated to public ownership, operating as quasi-governmental publicly owned companies. The quasi-governmental nature of the companies' operations was instrumental in allowing a general market perception to develop of the GSEs' debt and preferred shares being risk-free by virtue of an implicit government guaranty of repayment.

In *On the Brink*, former Treasury Secretary Henry M. Paulson Jr. cites foreign government unease over the safety of their holdings of in excess of $1 trillion of Fannie/Freddie debt. Recounting a trip to Beijing in April 2008, he describes Chinese Vice Premier Wang Qishan as being "most interested in the problems in the U.S. capital markets." Paulson adds, "I was candid about our difficulties. . . . *I stressed that we understood our responsibilities*" (*Brink*, 128; emphasis added).

The announcement of the GSEs' having been placed into conservatorship was made at a press conference on Sunday, September 7. Secretary Paulson cited the government's tolerance in

allowing the market's perception of an implicit guaranty to gain adherence. The period of tolerance had gone on "too long," he said, and was central to the Treasury's decision to support and finance GSE operations in conservatorship.

Under the terms of a stock purchase agreement, Secretary Paulson said, "common and preferred shareholders bear losses ahead of the new government senior preferred shares." He noted that "conservatorship does not eliminate the outstanding preferred stock, but does place preferred shareholders second after the common shareholders in absorbing losses."

FHFA director James Lockhart, appearing with Paulson, said that "in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding. Subordinated debt interest and principal payments will continue to be made."[1]

***

This paper examines the following issues:

    (1)    Did the GSE preferred shares enjoy an implicit guaranty of government repayment on and prior to September 7th, and, if so:

        a. was the government's implicit guaranty of the preferred shares materially different from its implicit guaranty of GSE debt obligations;

        b. was the government's implicit guaranty of the preferred shares terminated on September 7th;

        c. was the government's implicit guaranty of the preferred shares terminated at any time after September 7th, or is it still extant?

---

[1] Hereinafter, the above-referenced September 7th statements by Secretary Paulson and Director Lockhart are collectively referred to as the Risk of Loss and Dividend Suspension Announcement.

2

# II. <u>The Federal Government's Implicit Guaranty of GSE Preferred Shares</u>

## A. <u>Financial Obligations</u>

In an April 2009 working paper entitled "The 2008 Federal Intervention to Stabilize Fannie Mae and Freddie Mac" ("Frame"), financial economist W. Scott Frame of the Federal Reserve Bank of Atlanta summarized the government's implicit guaranty of GSE securities: "The features of Fannie Mae's and Freddie Mac's federal charters, coupled with some past government actions, [have] long served to create a perception in financial markets that the federal government '*implicitly guarantees*' the GSEs' financial obligations [emphasis added]." Frame notes that this is so "despite explicit language on . . . the GSEs' securities that they are not obligations of the federal government." He also notes that the GSEs issue "'government securities' as classified under the Securities Exchange Act of 1934" (Frame, 6).

The question of whether or not preferred shares issued by Fannie Mae or Freddie Mac qualify as government securities is addressed and answered squarely in Comptroller of the Currency Administrator of National Banks Interpretive Letter #931 (hereinafter IL #931), dated March 15, 2002. Employing 12 U.S.C. 24(7) as its authority, IL #931 states as follows:

> Section 24(Seventh) permits national banks to hold "mortgages, obligations, or other securities which are or even have been sold by [Freddie Mac] pursuant to section 305 or section 306 of the Federal Home Loan Mortgage Corporation Act."[2] Section 306(g) of the Federal Home Loan Mortgage Corporation Act empowers Freddie Mac to issue "preferred stock on such terms and conditions as the Board of Directors shall prescribe."[3] Freddie Mac preferred

---

[2] Indeed, the OCC [Office of the Comptroller of the Currency] previously relied on this same language in Section 24(Seventh) in concluding that national banks may purchase and hold preferred stock of Freddie Mac. Interpretive Letter No. 577, reprinted in [1991–1992 Transfer Binder] Fed. Banking Law. Rep. (CCH) ¶ 83,347 (April 6, 1992).
[3] 12 U.S.C. 1455(f). [Notes 2–5 are reproduced from IL #931.]

stock is a "security"[4] that national banks may hold under section 24(Seventh).

Section 24(Seventh) also authorizes bans to purchase and hold Fannie Mae perpetual preferred stock. Section 24(Seventh) permits national banks to hold "obligations, participations, or other instruments of or issued by" Fannie Mae. Since the term "instrument" is commonly defined to include securities,[5] we believe this language affords a basis for national banks to purchase and hold Fannie Mae perpetual preferred stock.

Section 24(Seventh) generally restricts national banks' dealing, underwriting, purchasing and selling securities. Section 24(Seventh) exempts Freddie Mac "securities" and Fannie Mae "instruments" from these restrictions. Thus, banks' holdings of Freddie Mac and Fannie Mae preferred securities are not subject to quantitative limits, other than safety and soundness considerations. Examples of the prudential controls the OCC would expect to see in a bank investing in these instruments include: implementation of appropriate diversification principles, adoption of concentration limits on the securities of any one issuer and consideration of the impact on the bank's overall interest rate and liquidity risk profiles.

**III. Conclusion**

Accordingly, a national bank may invest in perpetual preferred stock issued by Fannie Mae and by Freddie Max. This investment is not subject to quantitative limits on the amount of such stock that the bank may hold, but the amount is subject to safety and soundness considerations, including the prudential controls noted above." (Comptroller of The Currency Interpretive Letter #931, p. 2)

# B.  Preferred Shares

The question of whether or not preferred shares issued by Fannie Mae or Freddie Mac were implicitly guaranteed by the federal government on or before September 7th is addressed and answered squarely in a Board of Governors of the Federal Reserve System Internal Discussion Paper dated March 2012 (hereinafter Federal Reserve Paper 1045), which deals with

---

[4] Interpretive Letter No. 577, *supra*.
[5] *Black's Law Dictionary*, 5th ed. (West 1979).

4

the effect on community bank solvency and lending practices emanating from the Risk of Loss and Dividend Suspension Announcement.

Federal Reserve Paper 1045 conclusively establishes the existence of the government's implicit guaranty of GSE preferred shares as being indisputable, central to the issuance of the shares, and patently responsible for their outsized inclusion in bank and thrift portfolios through September 7, 2008. The report is illuminating in its outline of the general accord that existed among Congress, Treasury, rating agencies, and bank regulators—that is, the Federal Reserve, the OCC, the Federal Deposit Insurance Corporation (FDIC), and so forth—in their recognition of an implicit guaranty. Ownership of the shares was promoted as being nearly risk-free and suitable for bank and thrift portfolios. Congressionally bestowed statutory benefits allowed banks and thrifts to hold GSE preferred securities as approved capital, and favorable tax treatment allowed these institutions to avoid income taxes on 70 percent of the dividends. Institutional trust in the government's implicit guaranty blindsided bank and thrift institutions into holding, as Tier 1 capital, a total of more than $8 billion of the $34 billion of the shares outstanding on September 7th.

The Aa3 credit rating (that is, high quality, very low credit risk) assigned by Moody's and others to GSE preferred shares contributed to banks', thrifts', and conservative investors' purchasing and holding them. The rating, which rested on the federal government's implicit guaranty of repayment, was downgraded first on July 15, 2008, and then on August 22, 2008, in reaction to the expected enactment of the Housing and Economic Recovery Act of 2008 (HERA) and related *New York Times* articles alluding to a possible government takeover of the companies.

After September 2008, various regulatory agencies explored conservatorship's effects on banks and thrifts with respect to their ownership of GSE preferred shares. One Treasury

investigation cited in Federal Reserve Paper 1045 quotes the Treasury Department's Inspector
General as follows:

> One examiner stated that he would hesitate to tell a bank not to
> purchase GSE securities or raise a concentration concern because
> of the implied backing by the U.S. government. Two examiners
> told us that, in hindsight, it would have been a good idea to either
> mention the concentrations to management or require the bank to
> monitor its investment portfolio more closely. We accept that at
> the time NBC [National Bank of Commerce, described as "a small
> bank in Illinois with substantial GSE preferred stock investments"]
> made the purchases of the GSE securities, there would have been
> little basis to criticize the bank given the regulatory standards and
> perception of minimal risk associated with these holdings.
> Therefore, we do not fault OCC for not taking issue with NBC's
> investment practices. (Federal Reserve Paper 1045, 8)

Placing the GSEs into conservatorship resulted in their debt claim *financial obligations*
being fully preserved, mortgage-backed securities *financial obligations* remaining intact, and
dividends on common and preferred shares being wholly eliminated (absent explicit Treasury
authorization). The government acquired nearly 80 percent equity *financial obligation* stake in
each of the companies.

Financial markets interpreted the Risk of Loss and Dividend Suspension Announcement
as an explicit repudiation of the federal government's implicit guaranty of its preferred share
financial obligations—in turn resulting in near-total collapse of GSE preferred share market
prices when the markets opened on Monday, September 8th. Prior to September 7th, despite
widespread news coverage of the GSEs' financial stress (Fannie Mae, for example, reported a
total loss of nearly $24 billion for the third quarter of 2007 through the first quarter of 2008),
likely HERA enactment, and a rumored government takeover of the companies, preferred share
prices had held up well. That wellness emanated almost wholly from the fact that the market
continued to accept the government's implicit guaranty of repayment. In July and August, GSE

HF 10598648v.1

preferred shares consistently sold for between 45 percent and 60 percent of their stated face value.

Fannie Mae's common shares, which traded as high as $70.57 in 2007, closed at $28.12 on May 13, 2008, and traded as virtually worthless just prior to the September 7th announcement.

<u>Fannie Mae Series T 8.25 Percent Preferred and Common Stock</u>

| Date | Event | Preferred Price | Common Price |
|---|---|---|---|
| 2007–Summer 2008 | At the urging of Treasury Secretary Paulson and Fed Chairman Ben Bernanke, the GSEs between year-end 2007 and summer 2008 collectively sold $22 billion of the $34 billion (that is, 65 percent) of the preferred shares outstanding on September 7th, 2008. | | $70.57 (2007 high) |
| May 13, 2008 | Citigroup, UBS, Merrill Lynch, Morgan Stanley, and Wachovia concluded an offering for the sale of 80 million shares of Fannie Mae 8.25 percent preferred T with stated face value of $25 (that is, $2 billion). The dividend rate of 8.25 percent was reflective of the changing market perception of risk attached to GSE debt, MBS, and preferred stock beginning late 2007. The Series T offering was preceded by a Fannie Mae 8.75 percent preferred share offering for 41,696,401 non-cumulative *mandatory convertible* shares with stated face value of $50 (that is, $2.1 billion). | $25 | $28.12 |
| July 10, 2008 | | $19.03 | $13.11 |
| July 11, 2008 | *New York Times*, "U.S. Weighs Takeover of Two Mortgage Giants": <br><br>     "Alarmed by the growing financial stress at the nation's two largest mortgage finance companies, senior *Bush officials are considering a plan to have the government take over one or both of the companies and place them in conservatorship if their problems worsen*, people briefed about the plan said on Thursday. . . .<br>     "Under a conservatorship, the shares of Fannie and Freddie would be worth little or nothing. . . .<br>     "In the last week alone, Freddie has lost 45 percent of its value, and Fannie is off 30 percent. Expectations of default at the companies have also risen. . . . | $17.00 | $10.18 |

HF 10598648v.1

|  |  |  |  |
|---|---|---|---|
|  | "Shares of Freddie Mac plunged more than 30 percent and Fannie Mae's more than 20 percent in the first hour of trading on Thursday. By the close of trading, Fannie shares had fallen nearly 14 percent, and Freddie shares had dropped 22 percent. It was the second straight day of declines for the companies." |  |  |
| July 14, 2008 |  | $16.54 | $9.67 |
| July 15, 2008 | Moody's downgrades the GSEs | $14.00 | $7.02 |
| August 11, 2008 | Fannie declares a quarterly dividend of $0.5156 per share payable September 11, 2008, on Series T preferred shares | $16.35 | $8.35 |
| August 19, 2008 |  | $13.78 | $6.01 |
| August 20, 2008 | *New York Times*: "Shares of the mortgage finance giants, Fannie Mae and Freddie Mac, declined almost 25 percent on Wednesday on concerns that the companies will need a bailout from the federal government.<br>    "The decline almost matched the more than 24 percent drop on Monday and Tuesday. On Wednesday, Fannie Mae shares closed down 26.79 percent or $1.61 to $4.40." | $10.99 | $4.40 |
| August 21, 2008 |  | $10.80 | $4.85 |
| August 22, 2008 | Friday, 3:00 p.m. Wachtell, Lipton, Rosen & Katz hired by Secretary Paulson to put the GSEs into *receivership*.<br>Moody's issues its 2nd downgrade of GSE preferred shares. | $10.90 | $5.00 |
| September 5, 2008 | Friday pre-conservatorship closing price | $13.70 | $7.04 |
| September 8, 2008 | Conservatorship announced Sunday, September 7, 2008 | $3.00 | $0.73 |
| September 11, 2008 | Fannie pays a dividend of $0.5156 on its T series preferred shares | $2.45 | $0.78 |

As illustrated above, in the case of Fannie Mae's 8.25 percent preferred Series T shares, the market's perception of an implicit government guaranty for GSE preferred shares as a *financial obligation* was instrumental in the shares' market price holding up reasonably well from their May issuance through their September 8th collapse.

8

I was unable to find any evidence of Secretary Paulson's having focused on the implicit guaranty of GSE preferred shares at any time prior to September 7th. I have also been unable to find any direct mention of the implicit government guaranty in the memoirs of Secretary Paulson, Secretary Timothy Geithner, or Chairman Bernanke. Indirect examples of Secretary Paulson's and Treasury's knowledge of and exploitation of the government's implicit guaranty in promoting Fannie Mae's sale of $7.4 billion of its preferred and common shares in May 2008 are set forth in Appendix II, below. Regarding Wachtell, Lipton, Rosen & Katz ("Wachtell"), first employed to serve as outside conservatorship counsel to the government on August 22nd, I have been unable to ascertain their having any knowledge of the implicit guaranty at any time prior to September 7th.

As we have seen, market reaction to the Risk of Loss and Dividend Suspension Announcement was swift. On Monday, September 8, the Series T preferred share price collapsed by nearly 78 percent, a result of the market's interpreting Secretary Paulson's statement as an explicit government rejection of and abandonment of the guaranty of repayment.

# C.   Common Shares

Rather than revisit the legal road traversed in my conclusion that the GSE preferred shares are "*government securities*," let's simply employ basic logic in concluding that GSE common shares enjoy similar "government security" status. In May 2008 Fannie Mae sold 41,808,401 of $50 stated value 8.75 percent noncumulative mandatory convertible preferred shares, Series 2008-1 ($2.2 billion). While the transformation of the preferred shares into common shares would obviously change the extent of the government's implicit guaranty from the preferred shares' stated value to the converted shares' par value, it most certainly did not eliminate the shares' provenance as *government security obligations*. And while preferred shares

9

converted into common shares would then not qualify for inclusion in bank portfolios as Tier 1 capital, the common shares most certainly could be retained by bank owners as government securities acceptable for bank portfolio ownership at levels acceptable to the institution's regulators.

# III. <u>What Went Wrong</u>

## A. <u>September 7, 2008</u>

Prior to making the September 7th announcement, Secretary Paulson recounts that he called Chinese Vice Premier Wang Quishan: "'*I always said we'd live up to our obligations*,' I reminded Wang. '*We take them seriously.*'" (*Brink*, 15; emphasis added.) Secretary Paulson's belief in and personal allegiance to a heightened code of ethical conduct in dealings both governmental and private is well evidenced throughout *Brink*. Had he intended the Risk of Loss and Dividend Suspension Announcement to serve as the government's explicit abandonment and rejection of its prior implicit share guaranty, he would have said as much. A man who understands responsibility and takes it seriously does not employ equivocal or ambiguous language in announcing the abandonment of a responsibility. We thus need to examine Secretary Paulson's September 7th statement in order to form a clearer understanding of its intended reach and to understand what went wrong.

| **(1) <u>Secretary Paulson's Statement</u>** | **<u>Commentary</u>** |
| --- | --- |
| Additionally, under the terms of the agreement, | Were the GSEs ordinary, |

common and preferred shareholders bear losses ahead of the new government senior preferred shares.

rather than government-sponsored, entities, Secretary Paulson's prioritizing of common over preferred in loss incurrence would be correct. However, Fannie and Freddie were government-sponsored entities, and Secretary Paulson should have qualified his announcement to reflect that fact. What he should have said was that preferred share loss was limited to approximately $2 billion of annual passed dividends by reason of the implicit government guaranty.

These Preferred Stock Purchase Agreements were made necessary by the ambiguities in the GSE Congressional charters, which have been perceived to indicate government support for agency debt and guaranteed MBS. Our nation has tolerated these ambiguities for too long, and as a result GSE debt and MBS are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free. Because the U.S. Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and MBS.

Secretary Paulson neither seeks to evade nor minimizes government responsibility for having allowed GSE debt and MBS implicit guaranty ambiguities to arise and continue. The absence of a similar ethical reference with regard to the GSE preferred shares as government security financial obligations speaks volumes!

Market discipline is best served when shareholders bear both the risk and the reward of their investment. While conservatorship does not eliminate the common stock, it does place common shareholders last in terms of claims on the assets of the enterprise.

The statement regarding common shares bearing first market risk in the event of conservatorship loss incurrence is correct for both traditional and government-sponsored entities.

Similarly, conservatorship does not eliminate the outstanding preferred stock, but *does place preferred shareholders second, after the common shareholders, in absorbing losses*.

Secretary Paulson's statement of preferred shares sitting in second place behind common shares in risk of loss

11

The federal banking agencies are assessing the exposures of banks and thrifts to Fannie Mae and Freddie Mac. The agencies believe that, while many institutions hold common or preferred shares of these two GSEs, *only a limited number of smaller institutions have holdings that are significant compared to their capital*. (Emphasis added.)

The agencies encourage depository institutions to contact their primary federal regulator if they believe that losses on their holdings of Fannie Mae or Freddie Mac common or preferred shares, whether realized or unrealized, are likely to reduce their regulatory capital below "well capitalized." The banking agencies are prepared to work with the affected institutions to develop capital restoration plans consistent with the capital regulations.

sufferance is inappropriate because it ignores the explicit federal government guaranty of repayment.

Secretary Paulson's comment with regard to federal banking agencies assessing bank and thrift exposure is indicative of a concern limited to dividend suspension rather than one that includes intentional explicit guaranty rejection. In short, his concern is for small banks no longer being able to claim preferred share ownership as risk-free capital by reason of the conservatorship-imposed suspension of preferred dividend payment.

### (2) <u>FHFA Director James Lockhart's Statement</u>

### <u>Commentary</u>

. . . in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding. Subordinated debt interest and principal payments will continue to be made.

Dividends on Freddie Mac common and preferred shares were passed following the second quarter of 2008. In August 2008 Fannie's board of directors reduced its common stock dividend to $.05 per share for the third quarter of 2008. Fannie's board of directors prior to September 7th had declared a dividend on its preferred shares of between $100 million and $300 million payable at the end of the company's third quarter.

12

# B.  <u>Where Were the Regulators?</u>

Sheila Bair served as chair of the FDIC from June 6, 2006, to July 8, 2011. Treasury Secretary Paulson, New York Federal Reserve President Geithner, and Federal Reserve Chairman Bernanke were unanimous in praise of her tenacious guarding of the FDIC's insurance fund and efforts to access Troubled Asset Relief Program (TARP) funds for besieged mortgage borrowers.

Prior to September 7th, Bair was fully aware of the implicit government guaranty of GSE preferred shares. As noted in Federal Reserve Paper 1045, "the FDIC explicitly authorized state banks to invest up to 15 percent of Tier 1 capital in such an investment without the FDIC's prior consent, stating that such an investment does not represent a significant risk to the Deposit Insurance Fund. In other cases, the FDIC consented to banks investing up to 100 percent of their Tier 1 capital in auction rate preferred stock" (10).

Why, then, didn't Bair or any other regulatory head issue a warning to either Secretary Paulson or government counsel Wachtell regarding the implicit guaranty? Answer: Until the Risk of Loss and Dividend Suspension Announcement was made, neither Bair nor any other regulator was consulted. The decision to enter conservatorship was treated as top secret. By the time the issue arose after September 7th, Bair had more immediate demons, such as WaMu, Wachovia, and Indie Mac, to focus upon.

From September 7, 2008, through year-end 2009, 139 banks and 26 other depository institutions under FDIC jurisdiction failed. The FDIC in the course of the liquidation of those institutions accumulated approximately 31 million shares of GSE preferred stock whose stated face value was in excess of $1 billion. The FDIC sold those shares in the open market shortly before the expiration of Bair's term in July 2011. I posit that the FDIC held onto the shares for

13

nearly two years in tacit expectation of renewed market appreciation for their implicit government guaranty. I further posit that the sale was likely a response to a February 2011 Treasury white paper entitled "Reforming America's Housing Finance Market," which, as discussed later, called for elimination of the GSEs under various wind-down scenarios, although without specific mention of the companies other than by implication.

## C.  Blowback, Advice of Counsel, the Law, and GSE Third-Quarter Dividend Payments

### 1.  Blowback

Banking industry reaction after September 7th appears to have been muted—limited to letters to the Treasury and the Fed from the American Bankers Association and the Independent Community Bankers of America, complaining of the deleterious effect, on bank capital and lending policies, of suspending dividend payments. However, with the financial crisis mushrooming and nearly all eyes shifting from the GSEs to the banking sector, the issue never gained momentum.

Timothy Geithner served as the ninth president of the Federal Reserve Bank of New York between 2003 and 2009. Geithner and Fed Chairman Bernanke were instrumental in helping Secretary Paulson formulate and effectuate HERA's enactment, the GSE conservatorship, and TARP. In *Stress Test*, Secretary Geithner describes Washington's reaction to Secretary Paulson and the conservatorship announcement:

> Hank took a lot of grief for firing the bazooka so soon after telling Congress he wouldn't have to, and his reversal did give the impression that we were lurching from emergency to emergency

14

without a comprehensive plan. But he did the right and courageous thing, heedless of the political costs. . . .

> The reaction to Fannie and Freddie quickly made the backlash over Bear look mild. Senator [Jim] Bunning, who had said the Bear deal's assault on free enterprise made him feel like he lived in France, now said he felt like he lived in China. Senator Obama and the Republican presidential nominee, John McCain, both expressed outrage about pubic rescues of private firms, although they didn't directly criticize what Hank had done. McCain and his running mate, Sarah Palin, wrote a *Wall Street Journal* op-ed titled "We'll Protect Taxpayers from More Bailouts." Obama's campaign put out word that he didn't want a taxpayer-financed rescue of Lehman, which was also the emphatic consensus of both parties in Congress.

> The economy was clearly deteriorating with unemployment up to 6.1 percent, and no politician wanted to get on the wrong side of rising populist anger. (*Stress Test*, 175)

In the expanding anti-bank, anti–Wall Street, post–September 7th Washington political climate, Secretary Paulson was in no position to address the unintended consequence of his having lumped common and preferred shares together as shock absorbers. In addition, the preferred share price collapse resulting from the market's response to the Risk of Loss and Dividend Suspension Announcement rendered corrective retraction meaningless.

With HERA's enactment likely and newspapers warning of possible GSE takeover by the government, the market had already priced a conservatorship dividend suspension into GSE preferred shares by July. What the market had not done prior to September 7th was to price a government rejection of the implicit guaranty into the shares' market price. Market-efficient pricing in response to the government's seeming rejection of the implicit guaranty took place on September 8th.

Secretary Paulson, for reasons both political and economic, could not publicly correct or amend the September 7th announcement. Treasury did introduce a bank-specific bespoke tax relief program, allowing bank owners to treat their GSE share losses as ordinary income losses

15

rather than capital losses, and qualified banks were permitted entry into the TARP program. However, no similar relief was afforded non-bank preferred share owners.

## 2. **Advice of Counsel**

### a. Timeline

Employing *Brink* as my guide, I constructed the following timeline for events preceding the September 7th conservatorship announcement.

**Timeline**

| | |
|---|---|
| August 1–15 | Treasury retains Morgan Stanley to perform an in-depth review of the GSEs' cash flow, portfolio holdings, and debt obligations. |
| August 16 | Secretary Paulson concludes that he needs to get FHFA to put the GSEs into receivership. Treasury provides the FHFA with Fed, OCC, and Morgan Stanley cash flow reviews of the GSEs' portfolio holdings and debt obligations. |
| August 22 | Secretary Paulson hires Wachtell to serve as the government's outside conservatorship counsel, to guide it through the legal intricacies of law and corporate governance attendant to his decision to place the companies into receivership, or liquidation. |
| August 23 | Wachtell advises Secretary Paulson that in order to avoid practical and technical |

difficulties such as early derivative contract terminations, the government would

need to pursue conservatorship (like Chapter 11) rather than receivership for the

GSEs.

September 5    Treasury, Fed, and FHFA officials meet with GSE management to advise them of

the government's decision to place the companies into conservatorship.

September 6    Treasury, Fed, and FHFA officials meet with GSE boards of directors and

demand that they agree to the companies' being placed into conservatorship.

### b. Wachtell

Wachtell, Lipton, Rosen & Katz was hired by Secretary Paulson at 3:00 p.m. on Friday,

August 22, 2008, to guide the government through the intricacies of what Secretary Paulson

initially believed was going to be a GSE *liquidating receivership.*

> By the next morning they [Wachtell] had torn through the GSEs'
> debt and preferred stock document, and concluded that going the
> receivership route would be perilous for a number of practical and
> technical reasons. That approach would be terribly disruptive to the
> GSEs' businesses and extremely difficult to implement
> successfully in a short time frame, especially without the active
> involvement and cooperation of the GSEs' management in the
> planning stages. It would also have posed risks of court challenges
> and the early termination of the GSEs' valuable derivatives
> contracts. Receivership, which is used to liquidate companies,
> might trigger consequences every bit as bad as those we were
> trying to avoid, Wachtell said. By contrast, conservatorship was
> more like a Chapter 11 bankruptcy, where companies kept their
> current forms; it would provide a stable time-out for the GSEs to
> avoid defaulting on their debs and could be accomplished quickly.

HF 10598648v.1

> We were in a race against time. The markets were fragile, and we knew that September was going to be even rockier. Lehman was going to announce a dreadful loss, and Washington Mutual and Wachovia both appeared headed for trouble. We needed to take care of Fannie and Freddie before then or we would have a real problem. (*Brink*, 164)

Operating in total secrecy from New York, Wachtell miraculously effected the companies' entrance into conservatorship without aid from company management, company counsel, or federal regulators. The only reasonable explanation for Wachtell's not having addressed and dealt with the preferred share implicit guaranty issue prior to September 7th lies in the firm's not having been told of it.

Neither the GSEs' debt nor preferred stock documents refer to an implicit guaranty of repayment. Had Wachtell been alerted to the implicit guaranty, it could easily have adjusted the Risk of Loss and Dividend Announcement as set forth below.

> Additionally, under the terms of the agreement common ~~and preferred~~ shareholders bear losses ahead of the new government senior preferred shares. In accordance with the Stock Purchase Agreement, and Conservatorship Law, *annual dividend payments on the companies' preferred and common shares of approximately $2 billion have been suspended.*

> These Preferred Stock Purchase Agreements were made necessary by the ambiguities in the GSE Congressional charters, which have been perceived to indicate government support for agency debt, ~~and~~ guaranteed MBS, *and preferred shares*. Our nation has tolerated these ambiguities for too long, and as a result GSE debt, ~~and~~ MBS, *and preferred shares* are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free. Because the U.S. Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt, MBS, *and preferred shares*. ~~Similarly, conservatorship does not eliminate the outstanding preferred stock, but does place preferred shareholders second, after the common shareholders, in absorbing losses.~~

18

# 3. The Law of Dividend Payment

Authority for the FHFA to place the GSEs into conservatorship and act as conservator stems from the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by HERA in 2008. HERA replaced the act's conservatorship provisions with provisions based generally on federal bankruptcy law.

Under the United States Bankruptcy Code ("Bankruptcy Code"), the law dealing with dividend payments in insolvency is simple and unambiguous: A company while in bankruptcy has no legal power to reduce the insolvent estate by means of a dividend distribution to shareholders. That general rule persists in regard to both common and preferred share dividends, and it obtains even in the instance of preferred share dividends declared prior to, but unpaid as of, a company's entry into insolvency proceedings. The rule with regard to dividends payments by companies in conservatorship is in accord with that of the Bankruptcy Code.

The GSEs' preferred shares are redeemable at the companies' discretion at or after specified redemption dates. The shares are otherwise perpetual, noncumulative, and nonvoting. All of the foregoing is cited in support of my concluding that the government's implicit guaranty of the GSEs' preferred shares is not materially different from its implicit guaranty of GSE debt.

Absent conservatorship and Senior Preferred Stock Purchase Agreement (SPSPA) provisions, the dividends payable on every series of GSE preferred shares are noncumulative, declarable, and payable at the reasonable (good-faith) discretion of the companies' boards of directors. The GSEs' boards of directors' ability to eliminate dividend payments on the companies' noncumulative preferred shares is subject to discretionary review for reasonableness.

HF 10598648v.1

# IV. Fannie Mae's Third-Quarter 2008 Multi-Million-Dollar Dividend Payments

## A. Prohibition

Freddie Mac neither declared nor paid any share dividends in the third quarter of 2008 (Freddie Mac 10Q September 30, 2008, p. 138, note 8). However, Federal Reserve Report 1045 and Fannie Mae, in its 10K for 2008, admit to a Fannie Mae third-quarter preferred share dividend payment as follows:

1. The conservator announced on September 7, 2008, that we would not pay any dividends on the common stock or on any series of outstanding preferred stock. In addition, the senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities (other than the senior preferred stock) without the prior written consent of Treasury. *We were permitted to pay previously declared but unpaid dividends on our outstanding preferred stock for the third quarter*." (Fannie Mae 10K December 31, 2008, Part II, p. 76; emphasis added)

2. A last dividend payment was made at the end of the third quarter because it had been previously announced. *The Treasury believed it was legally obligated to make the payments given the prior announcement*." (Federal Reserve Paper 1045, p. 6, note 5; emphasis added)

Freddie Mac, in its 10K for 2008, discusses the restrictions of its payment of dividends:

Our payment of dividends is subject to the following restrictions:

*Restriction Relating to Conservatorship*

As Conservator, FHFA announced on September 7, 2008 that we would not pay any dividends of the common stock or on any series of preferred stock (other than the senior preferred stock). FHFA has also instructed our Board of Directors that it should consult with and obtain the approval of FHFA before taking actions involving dividends.

*Restrictions Under Purchase Agreement* [SPSPA]

The Purchase Agreement prohibits us from declaring or paying any dividends on Freddie Mac equity securities (other than the senior

> preferred stock) without the prior written consent of Treasury. (Freddie
> Mac 10K December 31, 2008, Part II, pp. 60–61)

Dividend payments on GSE preferred shares after September 7th were strictly prohibited, singly and in combination, by HERA provision, FHFA direction, and SPSPA agreement. *Yet following the Risk of Loss and Dividend Suspension Announcement, Fannie Mae paid an absolutely prohibited, patently illegal dividend of between $100 million and $300 million to the holders of certain of its preferred shares prior to the third quarter's end.* How did it do so, and why did it do so?

# B.  How and Why: Random Thoughts

The legal and contractual restrictions on GSE preferred share dividend payments in conservatorship announced on September 7th are clear and straightforward. Nevertheless, Fannie Mae was "*permitted to pay previously declared but unpaid dividends on our [its] outstanding preferred stock for the third quarter.*" One can imagine the following conversations taking place between Fannie Mae and Treasury officials on September 8th and 9th:

<u>September 8th</u>

<u>Fannie</u>:  Hey, guys, thanks for taking our call, but we think we need to get some clarification with regard to yesterday's dividend suspension announcement. We are uncertain as to whether or not the dividend payment restriction announced yesterday applies to the $100 million which we deposited with our paying agent last Friday to fund the dividends payable on the $4.325 billion of preferred shares that we were able to sell in May, thanks to the bosses' ongoing implicit guaranty of our securities.

<u>Treasury</u>:  When is the payment scheduled to be made?

<u>Fannie</u>:  Thursday.

<u>Treasury</u>:  Uh, thanks, we'll get back to you.

21

<u>September 9th</u>

<u>Treasury</u>:  Hey, guys, thanks for taking our call. *We believe that you are legally obligated to make the payments because of their prior announcements.*

<u>Fannie</u>:  That's a yes, no?

<u>Treasury</u>:  Make the payment!!!

<u>Fannie</u>:  Can we have it in writing?

(*Zzzz. Connection broken.*)

Other people get paid for making jokes. I don't. But given that there is so little documentation, we can only assume that on September 8, 2008, when Treasury directed Fannie Mae to make a third-quarter dividend payment, the payment directive was issued using language substantially in accord with that reported in 2012 by the authors of Federal Reserve Paper 1045: "The Treasury believed it was *legally obligated* to make the payments given the prior announcement" (Federal Reserve Paper 1045, p. 6, note 5; emphasis added). With prior declaration being legally irrelevant in the absence of an overriding legal directive, the sole justification for Fannie's September 2008 dividend payments can only be anticipatory breach. The payment was morally mandated rather than strictly legal-driven. Treasury wanted to avoid litigation claims.

What the government might have said to Fannie was:

> Payment of Fannie's declared but unpaid preferred share dividends were made necessary by the ambiguities in the GSE Congressional charters, which have been perceived to indicate government support for preferred shares' stated value in liquidation. Our nation has tolerated these ambiguities for too long, and as a result GSE preferred shares are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free. Because the U.S. Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE preferred shares.

Treasury, for political and economic reasons, could not have publicly made the statement set forth above in the period between September 8th and September 11th, 2008. However, it most certainly could have made the statement to Fannie Mae in confidential memorandum. Treasury's failure to do so marks the onset of the government's perfidious conduct in its treatment of GSE preferred share owners in conservatorship.

# V.  <u>Omertà</u>

Omertà is an intensely strict code of silence among persons in near-conspiratorial agreement. I don't intend to insult the government by using the term. Rather, I intend to fix September 8, 2008, as the onset of the federal government's silence on the subject of the implicit guaranty of payment of the GSE preferred shares.

In February 2011, Treasury issued a 32-page white paper to Congress entitled "Reforming America's Housing Finance Market." At its core, the paper sets forth as its objective "the orderly and deliberate wind down of Fannie Mae and Freddie Mac." Three wind-down options are laid out. The paper contains no mention of either GSE preferred shares or the federal government's implicit guaranty of the shares' repayment:  it's sort of a no-harm, no-foul *erasure* of the government's implicit guaranty. Effectively, the government after September 7th converted Secretary Paulson's innocent conflation of common and preferred shares into an unspoken government policy of  denying repayment to preferred shareholders absent GSE liquidation.

As luck would have it, the government till now has enjoyed a virtually litigation-free period with respect to the preferred share implicit guaranty issue. Adding to its good fortune is the silence of the press.

HF 10598648v.1

## A.  Litigation

### 1.  In re Fannie Mae 2008 Securitas Litigation

By year-end 2008, several class-action lawsuits had been initiated against Fannie Mae in connection with preferred share and common security offerings made between November 2007 and May 2008. All of the suits alleged violation of the 1933 Securities Act (the "1933 Act"). None alleged breach of the implicit guaranty. The suits were dismissed in November 2009 by reason of Fannie Mae's status as a government instrumentality, which specifically exempts it from any 1933 Act liability.

### 2.  The Third Amendment Lawsuits

Following the passage, in August 2012, of the Third Amendment to the SPSPA, which authorized a net-worth dividend sweep, a series of lawsuits were initiated alleging breach of contract and government taking. To date, none of the lawsuits have alleged either breach or anticipatory breach of the government's implicit guaranty of the GSE preferred shares' repayment. My guess is that allegations of implicit guaranty breach by reason of the government's bad faith in restricting preferred share dividend payments amid a cornucopia of positive earnings will not be long in coming.

## B.  The Press

Prior to a recent spate of articles questioning the government's direction and the financial management of the GSEs in conservatorship (discussed below in Part Two), the government has enjoyed near-universal favorable financial press coverage in connection with the Third Amendment sweep and attendant litigation. Two *Wall Street Journal* opinion pieces are

24

illustrative of the press's unquestioning acceptance. (Links to the full articles may be found in Appendix II, below.)

# 1.   <u>Holman W. Jenkins Jr.</u>

In "Fannie and Freddie's Propaganda War," a *Wall Street Journal* article dated December 12, 2015, Holman Jenkins wrote:

> By far the loudest voice raised against Fannie and Freddie's long-discussed liquidation comes from big-time fund managers Bill Ackman of Pershing Capital, Richard Perry of Perry Capital, and Bruce Berkowitz of Fairholme Capital Management.
>
> Why? After noticing that the government's stated, bipartisan intention to wind them up had driven down their shares to penny-stock levels, these fund managers opportunistically began buying great gobs of their stock. These funds were able to score large, instant profits for their investors simply by mounting a visible campaign to suggest the government's intended outcome might be in doubt.

Ackman's fund owns mostly, if not entirely, GSE common shares, and Perry's fund and Berkowitz's fund own mostly, if not entirely, GSE preferred shares. I own GSE preferred shares, and since before September 7th, I have not owned any GSE common shares. One would expect a reporter of Mr. Jenkins's stature to ferret out the existence of possible divergence in motive and investment strategy among the three fund managers. With common and preferred firmly fixed as one in his mind, Jenkins thus mistakenly refers to the three fund managers in the singular as "the loudest voice."

Citing the government's "stated, bipartisan intention to wind them up" as the three fund managers' opportunistic buying point is of course ludicrous given Treasury's 2011 white paper wind-down announcement. I don't speak for any of the three fund managers. I do, however, speak for myself as owner of both Fannie Mae and Freddie Mac preferred shares. I believe that both Perry and Berkowitz, if asked, would have told Jenkins of their commitment to seeing the

25

GSEs being adequately recapitalized and responsibly reprivatized following the enactment of legislative reform. If asked, I believe the fund managers would tell Jenkins that their immediate objective is not recap and release but rather to compel the return of the $200 billion of Treasury-looted assets to the companies. If asked, I believe that they would implore Jenkins to employ his *Wall Street Journal* pulpit to urge the government to abandon asset looting, abandon its policy of omertà in regard to the GSE implicit guaranty, and issue something like the following:

> Directing the GSEs into conservatorship and restricting the payment of preferred share dividends was made necessary by the financial crisis of 2008. In the past, ambiguities in the GSE congressional charters were perceived to indicate government support for GSE preferred share stated value repayment. Our nation has tolerated these ambiguities for too long. GSE preferred shares were held by banks and investors throughout the United States and around the world who believed them to be virtually risk-free. Because the U.S. government created these ambiguities, we have a responsibility to both avert and ultimately address the issue of investor holdings of GSE preferred shares. Effective as of August 2012, the Third Amendment cash sweep is being retroactively terminated. Dividend payments on GSE preferred shares will be resumed as of that date.

## 2.   **John Carney**

On December 18, 2015, the *Wall Street Journal* published John Carney's "Why Fannie Mae Revival Hopes Are Withering on Capitol Hill," in which Carney refers to the Jumpstart GSE Reform Act of 2015–16:

> The catalyst appears to be a small provision known as the Jumpstart GSE Act in the omnibus spending agreement reached on Capitol Hill. The provision prohibits Treasury from selling its preferred stakes in the mortgage-finance companies for at least two years.
>
> This effectively rules out any chance the companies could be recapitalized and released from conservatorship until 2018, something for which a coalition of investment firms and affordable-housing advocates have been pushing.

> At first blush, that shouldn't be cause for despair for Fannie and Freddie shareholders. After all, officials from the White House and Treasury Department have made clear they oppose recap and release.
>
> Despite this, some investors had held out hope. They should now let it go—the thing that wasn't going to happen really, really isn't going to happen.
>
> A bigger negative, though, may be the effect Jumpstart could have on lawsuits brought against the government by several shareholders. These ask courts to undo a 2012 deal that requires the companies to pay nearly all of the earnings in dividends to the Treasury.
>
> Jumpstart may hurt the shareholder cases because it suggests Congress agrees with Treasury that the profit sweep is legal.

One might reasonably expect a reporter of Mr. Carney's stature to at least question the supposed coalition's members as unified in an immediate "recap and release" agenda. One might reasonably expect a reporter of Mr. Carney's stature to have directly sought confirmation from one or more of the acknowledged GSE preferred share owners regarding the owner's Jumpstart enactment views. Had Mr. Carney contacted me, for example, I would have told him that the Jumpstart GSE Reform Act provisions contained in the federal budget specifically prohibit Treasury for two years from "selling, transferring, relinquishing, liquidating, divesting, or otherwise disposing of any outstanding shares of senior preferred stock acquired pursuant to a specified Senior Preferred Stock Purchase Agreement between Treasury and an enterprise until Congress has passed and the President has signed into law legislation that includes a specific transfer of the preferred stock so acquired." I would have said that to me, Jumpstart is little more than a feeble congressional finger in the dyke, seeking to blunt the tidal buildup of negative public reaction emanating from media exposés of Treasury asset looting. I would have pointed to two pieces—the December 12, 2015, *New York Times* article entitled "Fannie and Freddie Government Rescue Has Come with Claws ("Claws") and *Fortune* magazine's "Uncle Sam's

27

$130 Billion Money Grab," published on December 1, 2015—as the basis of my view. Finally, I would say, "Mr. Carney, you've been had by government omertà, and you really should read Federal Reserve System Internal Discussion Paper 1045." I am not a member of any coalition, and I don't know what other GSE preferred shareholders advocate or hold dear, but GSE preferred share owner Joshua Angel's GSE timetable does not include immediate GSE recap and release. Rather, Joshua Angel wants the federal government to immediately stop its GSE asset looting, abandon its policy of omertà in regard to the implicit guaranty, and restore GSE preferred share dividend payments.

For virtually all of the fifty-seven years following my graduation from Columbia Law School in 1959, I have labored as a practicing attorney specializing in commercial insolvency, initially as the founder and managing partner of Angel & Frankel, PC, and then for the past ten years as senior counsel to Herrick, Feinstein LLP. For me, the GSE conservatorship is just another bankruptcy, albeit one that has consumed me as an investor since late 2013. As an insolvency attorney, my habit has been to learn as much as I can about a case for which I am being engaged, even before the engagement's formal onset. As a self-directed nonprofessional investor I follow the same procedure, albeit with less success than I enjoyed in my more active professional life. My GSE implicit government guaranty epiphany did not come to me in an instant, or at the onset of making an investment in GSE preferred shares. Rather, it came to me, as in my active practice days, by dint of habitual, continuous case questioning and evidence examination. Holman Jenkins and John Carney are highly respected journalists. I fault them not because we have different opinions but rather because in voicing their opinions they stopped looking, while I did not.

# PART TWO

# Mismanagement

## I.   A Tale of Two Cases

## A.   <u>The GSE Fraud Recovery Case</u>

With apologies to Dickens, "the worst of times" for Fannie Mae and Freddie Mac was undoubtedly marked by their 2008 descent into government-directed conservatorship with a government federal agency as their administrator. The government's chief rationale for the action was the theoretical risk of depression that it was believed a GSE failure would pose. From the onset of their conservatorships, the companies were demonized as pervasive wrongdoers and blamed for the collapse of the housing mortgage market. In 2008 Secretary Paulson described conservatorship as a sort of beneficent "time-out" during which Congress and a new administration could address potential reform. A presumably benign conservatorship was in short order transformed into de facto nationalization. James Lockhart, employing HERA-endowed powers, (a) opted to appoint the FHFA, rather than an independent person, to serve as conservator, and (b) discharged the GSEs' independent boards of directors and replaced them with FHFA nominees whose sole fiduciary obligation and duty was to the GSE conservator (collectively hereinafter "Elimination of GSE Fiduciary Oversight"). The Elimination of GSE Fiduciary Oversight early on set the stage for the two companies to be drafted into government service in order to effect the Obama administration's off-budget housing assistance and

economic recovery programs. The Elimination of GSE Fiduciary Oversight marks the onset of Treasury's $200 billion asset looting, carried out with the blessing of the conservator and a captive GSE board of directors.

Attendant to the companies' de facto nationalization, the entire cost of the government's Home Affordable Refinance Program (HARP) and the administrative cost of its Home Affordable Modification Program (HAMP) were legislatively offloaded onto the GSEs without public comment and without resistance from the captive board of directors. Concurrent with de facto nationalization, owners of GSE common and preferred shares lulled themselves into complacency by accepting HERA's statutory admonition that the FHFA's management of the GSEs be conducted to "preserve and conserve" GSE assets and property in "sound and solvent condition."

A 2010 Treasury memorandum outlined "the administration's commitment to ensure existing *common equity owners* (emphasis added) will not have access to any positive earnings from the GSEs in the future." The memorandum did not surface publicly until March 2014. FHFA brought suit in September 2011 against eighteen financial institutions, alleging fraudulent misrepresentation and violation of the Securities Act of 1933 in connection with the pre-conservatorship sale of more than $200 billion of allegedly defective mortgage debt to the GSEs (collectively the "GSE Fraud Recovery Case"). By spring 2015, nearly $20 billion in settlement and trial judgment recoveries were obtained by the FHFA on behalf of the GSEs from seventeen of the eighteen case defendants. The eighteenth GSE Fraud Recovery Case is expected to go to trial this year. Based upon results obtained in the seventeen concluded actions, a recovery estimate of $5 billion from the eighteenth case would appear to be reasonable (collectively "Litigation Recoveries").

In "Claws," Gretchen Morgenson, the *New York Times* assistant business and financial editor, cites an FHFA source for her fixing Treasury's 2013/2014 GSE litigation haul at $38.5 billion. The proceeds obtained, together with case-revealed evidence of pervasive mortgage originator fraud, provide conclusive evidence of the GSEs as victims of, rather than perpetrators in, the mortgage market's collapse. Despite overwhelming evidence to the contrary, the GSEs, rather than the truly responsible too-big-to-fail mortgage originators, continue to be vilified politically and by the media as public enemy number one in the great recession.

Fixated with a depression mentality, the Treasury directed that the GSEs' financial statements be adjusted to reflect massive deferred tax asset write-offs and aggressive increases in securitized mortgage loss reserves totaling nearly $100 billion (the "Depression-Guess GSE Capital Losses"). Treasury-directed Depression-Guess GSE Capital Losses were a key both to Treasury's obtaining the FHFA's 2008 declaration of GSE insolvency and the resulting imposition of conservatorship. Ironically, seven years later, Litigation Recoveries obtained from the FHFA's conduct of the GSE Fraud Recovery Case, together with the reversal of nearly $100 billion of Depression-Guess GSE Capital Losses, provided the vast majority of the real $130 billion GSE *cash* payment to Treasury in excess of the 10 percent dividend initially imposed by the 2008 SPSPA. That $130 billion payment was effected pursuant to the net-worth sweep imposed by the Third Amendment. It was wordlessly accompanied by the unannounced expansion of the 2010 Treasury memorandum policy into the unwritten policy of omertà and perpetual denial of shareholder access to positive GSE earnings.

As noted in "Claws," "The timing of the 2012 profit sweep announcement was fortunate for the Obama administration: It followed a tumultuous period when government spending had come up against the debt ceiling, threatening to cause a federal default with potentially catastrophic consequences. Since then, the profits from Fannie and Freddie have helped the

31

Treasury Department manage its debt during showdowns with Congress." For the mathematically minded, adding approximately $46 billion of unreimbursed HARP/HAMP expenses to approximately $20 billion of Litigation Recoveries and then adding the $130 billion Third Amendment sweep adds up to nearly $200 billion of assets looted by the government.

***

My belief is that, while the money was great, Treasury's main purpose in effectuating the Third Amendment looting of  assets did not originate in the administration's need to raise cash attendant to its dysfunctional budget relationship with Congress. Rather, I believe that the Third Amendment dividend sweep had its origin in anticipation of GSE profits likely leading to shareholder demand for dividend payments. When the SPSA was executed in September 2008, Treasury had little to fear that the dividend restriction provisions of the document would or could be complained of.

Federal Court of Claims' information recoveries revealed to date have already completely eviscerated the government's stated rational for the Third Amendment net-worth sweep. As litigation continues, the Treasury-imposed omertà-like silence will break, and truth in government will once again prevail.

A recurrent theme emanating from the government since 2012, and consistently echoed by the *Wall Street Journal* editorial staff and other financial media, has been that Fannie and Freddie do not earn enough to repay senior preferred and to recapitalize. We respectfully disagree. Jumpstart aside, for example, were the government to simply credit the $130 billion of its double-dealing Third Amendment cash takings against the SPSPA senior preferred balance of $189.5 billion and reimburse the GSEs for approximately $46 billion of offloaded government

32

HARP and HAMP expenses, the remaining SPSPA balance could be repaid out of petty cash. Recapitalization could easily be effected through simple reinstatement of junior preferred as dividend-paying as of August 2012, coupled with a public offering of the government's common share holdings. The assertion of inadequate earning capacity as excusing continued nationalization of the GSEs simply does not hold together when the companies' profitability is truthfully examined. Keep in mind that during seven years of conservatorship, the government, by imposing nearly $46 billion of unreimbursed HARP/HAMP expenses on the GSEs, effectively reduced their operating profits for the same period, in equal amount.

Based upon my conversations with significant preferred share owners, I can say with absolute confidence that any assertion of their demanding an immediate recap and release  to public ownership is a total government fabrication—a smoke screen, designed to mask the looting of nearly $200 billion of assets.

Approximately 20 percent of Fannie and Freddie ownership was left in public hands following the conservatorship imposition in order to avoid a nationalization sticker's being imposed and the Treasury's having to put $5 trillion of the GSEs' guaranteed and direct debt obligations on the government balance sheet. As candidly acknowledged in deposition by Timothy Geithner, ongoing GSE public ownership was a government fiction, and the companies were from their conservatorship start "effectively nationalized." The issues now for preferred share owners are (a) reinstatement of dividends as of August 2012, or (b) resolution of their Fifth Amendment right to receive just compensation—with interest.

# B. <u>The GSE Preferred Share De Facto Nationalization Case</u>

HF 10598648v.1

*Starr International Company, Inc., v. The United States* (the "AIG Case") had as its core issue whether or not the owners of an insolvent borrower retain the basic constitutional right to receive just compensation for property taken by governmental action. The judge's opinion in the case was clear in its condemnation of the government's heavy-handed bailout treatment of the AIG Company. That treatment, while an irritant, did not distract the court from recognizing the core case issue to be not one of good v. evil, or crisis expediency as an excuse for ignoring constitutional rights, but rather government obeisance to the rule of law as an absolute. In its opinion, the court said: "The Government's unduly harsh treatment of AIG in comparison to other institutions seemingly was misguided and had no legitimate purpose, even considering concerns about 'moral hazard.' *The question is not whether this treatment was inequitable or unfair, but whether the Government's actions created a legal right of recovery for AIG's shareholders*." (Emphasis added.)

I initially thought it strange that the court made no mention of the similarity between the initial basic treatment afforded AIG and the GSEs in rescue program dollar amounts, interest/dividend rates, and 80 percent common stock ownership dilution. On further thought, I realized that the court did not make the comparison because it could not. The government's mistreatment of the GSEs, commencing with the Elimination of GSE Fiduciary Oversight and followed by the 2012 Third Amendment profit sweep, separately and in combination were so over-the-top heavy-handed and punitive as to make comparison impossible except with other de facto and de jure nationalizations.

The government has steadfastly refused to acknowledge or address the preferred share dividend reinstatement, the implicit guaranty, or the de facto taking issues. Preferred share owners, relegated to nonperson status, were thus forced to seek redress from the government's heavy-handed treatment in the courts. By the simple device of continuing Secretary Paulson's

34

unintentional error of lumping together the GSEs' common and preferred share owners, the government has been able to avoid $2 billion of annual preferred share dividend payments for more than seven years.

A May 20, 2014, *Wall Street Journal* piece provides proof perfect of the government's insensitivity, quoting FHFA director Mel Watt as having said that "it isn't his job to worry about shareholders of the companies, for which the FHFA act as conservator." According to Watt, "'My responsibility in the conservatorship is not to the shareholders, really. So I don't lay awake at night worrying about what's fair to the shareholders.'" He is not alone in his indifference.

In late 2015, Senator Robert Corker pointedly ignored the anti-GSE equity owner bias of his own Corker-Weaver–sponsored bill when he was quoted as saying that he had nothing against GSE shareholders, adding: "They'll have their day in court." To that I respond, "Why, sir, do GSE preferred shareowners have to go to court to receive dividend payments on shares issued with a government's implicit guaranty of payment?"

In a well-reasoned December 2015 report entitled "GSE Reform: Something Old, Something New, and Something Borrowed," managing director Joshua Rosner of Graham Fisher & Co. reviews the historical web through various permutations, from Fannie Mae's New Deal inception through HERA. For GSE conservatorship guardians FHFA Director Watt, Treasury Secretary Jack Lew, and Senator Corker, I cite the report as a must-read.

I own both Fannie Mae and Freddie Mac preferred shares. I purchased my shares in recognition of the government's ongoing implicit guaranty. I purchased my shares because the companies' book and enterprise values have at all times exceeded the shares' $34 billion of combined stated value by multiples.

Secretary Paulson candidly admitted in testimony to Congress that the GSEs were drafted into government service as the "best engines" to get financial mortgage markets unfrozen and

moving again. The country was in crisis, and there is no shame in the government's nationalization of the GSEs. However, the government's bad faith refusal to reinstate preferred share dividend payments, its Third Amendment sweep of $130 billion of GSE cash, and its imposition of $46 billion of unreimbursed HARP/HAMP costs upon the GSEs are separately and in combination legally untenable and shameful.

Treasury currently owns 79.9 percent of the GSEs by virtue of common stock warrants obtained for nominal consideration in the form of a commitment fee for the 2008 rescue financing. The government's warrant interests represent the largest commitment fee ever paid to any recipient by any company in financial history, and the country's best investment since the Louisiana Purchase. In conservatorship, the government has come off very, very well in its offloading of expenses and dividend and warrant value receipts. In the face of that joint wellness, the government's seven-year refusal to restore approximately $2 billion of annual preferred dividends will prove to have been a bad faith anticipatory repudiation of its implicit guaranty of the preferred shares' contractual dividend entitlements when the courts rule, as they must, in favor of preferred shareowners on the implicit guaranty dividend reach and the GSEs' de facto nationalization. The Elimination of GSE Fiduciary Oversight was instrumental in allowing unhampered Treasury looting of nearly $200 billion of GSE assets. The same Elimination of GSE Fiduciary Oversight mandates a court finding of GSE de facto nationalization.

Without doubt, the government's treatment of GSE preferred shareowners, its preferred share hawking and ongoing post–August 2012 restricted dividend policy, and the Third Amendment money grab are individually and collectively immoral. The immorality of the government's repudiation of its implicit guaranty of preferred share payment is beyond shameful.

HF 10598648v.1

Only when the preferred dividend restitution and taking issue are disposed of can the debate legitimately move on to reform, and what to do with the government's ownership stakes. I believe that Fannie and Freddie should be responsibly reformed and reprivatized, with Treasury's de facto 100 percent ownership being sold over time to public investors.

The Congressional Budget Office (CBO) is a federal agency charged with providing budget and other economic information to Congress. In January 2010 the CBO, in a report to Congress, focused on the government's ownership and direction of GSE activities: "In the judgment of the CBO, those actions make Fannie Mae and Freddie Mac part of the government and imply that their operations should be reflected in the federal budget."

Rather than permit the economic absurdity of de facto nationalization, Treasury asset looting, and government anticipatory repudiation of its implicit guaranty of the GSEs' preferred share payments to continue and fester, the government should publicly own up to the charade of its conservatorship errors. At the same time, in the next federal budget, it should announce Treasury's acceptance and adoption of the CBO's suggested accounting treatment for GSE receipts and disbursements and lay out a plan: (a) to resume payment of GSE preferred dividends on a cumulative basis retroactive to August 2012 or (b) to redeem preferred shares at their stated face value with payment of taking interest from 2008.

In reasonable time thereafter, GSE common share owners should be offered ratable redemption payment, with the right to contest similar to that of a dissenting shareholder in any take private transaction.

HF 10598648v.1

# **Conclusion**

I believe that the GSEs should be responsibly reprivatized, with proceeds being legislatively directed to finance public housing, education, healthcare, and other social programs. The worst option would be to throw the money obtainable from a GSE reprivatization away, and that is exactly what will happen if no action continues to be the government's chosen path. In the past, the government's stated reason for liquidating Fannie and Freddie was that they were flawed. Obviously—but keep in mind that more than seven years of conservatorship has now securely validated the GSE model as a worldwide housing finance best. Prudent owners fix flawed but valuable companies, just as prudent governments make use of the best available engines when the country is in crisis mode. American taxpayers were big-time losers in the financial crisis of 2008. Handled correctly, the responsible reformation and reprivatization of Fannie Mae and Freddie Mac could set the stage for a big come-from-behind American taxpayer win.

Joshua J. Angel, Esq.
Senior Counsel
Herrick, Feinstein LLP

HF 10598648v.1

# <u>APPENDIX</u>

## I.

1. Comptroller of the Currency Administrator of National Banks Interpretive Letter #931, April 2002

   **http://www.occ.gov/static/interpretations-and-precedents/apr02/int931.pdf**

2. Board of Governors of the Federal Reserve System International Finance Discussion Papers—IFDP 1045, March 2012

   **http://www.federalreserve.gov/pubs/ifdp/2012/1045/ifdp1045.pdf**

3. *New York Times*, July 11, 2008, "U.S. Weighs Takeover of Two Mortgage Giants"

   **http://www.nytimes.com/2008/07/11/business/11fannie.html**

4. *New York Times*, August 19, 2008, "Some Investors Say U.S. Bailout of Housing Giants Is Inevitable"

   **http://www.nytimes.com/2008/08/20/business/20fannie.html**

5. U.S.D.C.S.D.N.Y. In re Fannie Mae 2008 Securities Litigation (08 Civil 7831 PAC) Order, November 24, 2009

   **http://securities.stanford.edu/filings-documents/1040/FNM_01/20141024_r01x_08CV7831.pdf**

6. *Wall Street Journal*, December 12, 2015, "Fannie and Freddie's Propaganda War"

   **http://www.wsj.com/articles/fannie-and-freddies-propaganda-war-1449876249**

7. *Wall Street Journal*, December 18, 2015, "Why Fannie Mae Revival Hopes Are Withering on Capitol Hill"

   **http://www.wsj.com/articles/why-fannie-mae-revival-hopes-are-withering-on-capitol-hill-1450384375**

HF 10598648v.1

# II.

# Fannie Mae Exploitation of the Federal Government's Implicit Guaranty of GSE Financial Obligations in the May 2008 Sale of $7.4 Billion of Its Preferred and Common Shares

## Henry M. Paulson Jr., *On the Brink*:

Page 3

But Fannie and Freddie were congressionally chartered companies that already relied heavily on implicit government support . . .

Pages 112–13

*Sunday, March 16, 2008*

Meantime, as we raced to save Bear, we saw an opportunity to take a positive step with Fannie Mae and Freddie Mac. The market's weakness ultimately stemmed from housing troubles, and they were right in the center of that. A negative *Barron's* cover story the previous weekend had hit them hard.

Why not use the crisis to our advantage? Tim and I believed some positive news from Fannie and Freddie might help the market. I called [Treasury Undersecretary for Domestic Finance] Bob Steel and asked him to arrange a conference call with the GSEs and their regulator, OFHEO [the Office of Federal Housing Enterprise Oversight, which in 2008 was combined with the Federal Housing Finance Board to form the FHFA], to nail down an agreement he had been working on. Steel, on the fly, rounded up Fannie Mae CEO Dan Mudd, Freddie Mac CEO Richard Syron, and OFHEO chief Jim Lockhart, and we jumped on a conference call for about half an hour beginning at 3:00 p.m.

Fannie and Freddie were operating under a consent order temporarily requiring 30 percent more capital than mandated by federal statute. They were pressing to have this surcharge removed early. To get them to raise more capital—which we felt they sorely needed—Steel and Lockhart had for weeks been pushing a

40

deal: for every $1.50 to $2 of new capital the GSEs raised, OFHEO would reduce the surcharge by $1.

I had no time to waste, so I began the call by saying we were expecting to get a deal done on Bear Stearns and that we wanted an agreement from the GSEs to help calm the market. Steel had done his work well, and we quickly hammered out an agreement that, we estimated, would lead each firm to raise at least $6 billion. We calculated that this, in turn, would translate into $200 billion in much-needed financing for the sagging mortgage market. We agreed to make the announcement as soon as possible. (It was made on March 19.)

Page 139

While Congress dithered, the markets got jittery. I was at a meeting of finance ministers from the Americas and the Caribbean in Cancún, Mexico, on June 23, when I heard that Freddie Mac shares had dropped below $20. That was off more than $10 since they'd announced plans to raise capital in March. I'd been hoping all along that the GSEs would be able to raise capital. Fannie had done so in May and June, raising $7.4 billion in common and preferred stock. But Freddie had not done anything. Now they would not be able to access the market, and we did not have the legislation we needed to protect them or the taxpayers.

# III.

# Fannie Mae Capital Raise Roadshow, May 2008

Page 4

Recent actions on conforming jumbos, lifting the portfolio cap, and reduction in required capital surplus signal policy and regulatory support for Fannie Mae's liquidity mission.

**http://www.fanniemae.com/resources/file/aboutus/media/05_2008_Roadsho w_Presentation.pdf**

41

# **Biography**

Since graduating from Columbia Law School in 1959, Joshua (Josh) Angel has specialized in corporate reorganizations for nearly his entire legal career—first at Angel & Frankel, PC, which he founded, and where he served as managing partner for nearly forty-six years, and then from January 2007 as senior counsel to the firm of Herrick, Feinstein LLP, 2 Park Avenue, New York, NY 10016.

## **Acknowledgment**

In the space of fifty-six years at the law, I have, without benefit of strict count, written briefs, affidavits, motions, articles, and other arguments numbering in the many thousands, but no pamphlets, not even a mini-one like "Government Perfidy and Management of the GESs in Conservatorship." Legal readability is one thing, normal discourse another. In writing "Government Perfidy," my hope was to translate a complex legal analysis of what I believe to be government abuse in connection with the GSEs' conservatorship into something readable—and understandable to non-lawyers. As a first-time author, how fortunate was I to have met Janet Byrne and convinced her to be my editor. I hope that she remains a friend for life. My admiration for and indebtedness to her are unbounded. Janet, thank you!

# EXHIBIT B



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.

SECRETARY OF THE TREASURY

December 21, 2017

The Honorable Melvin L. Watt
Director
Federal Housing Finance Agency
400 7th Street SW
Washington, DC 20219

Dear Director Watt:

Reference is made to the Amended and Restated Preferred Stock Purchase Agreement dated as of September 26, 2008, as amended (the Agreement), between the United States Department of the Treasury (Treasury) and the Federal Home Loan Mortgage Corporation (the Enterprise), acting through the Federal Housing Finance Agency as its Conservator, and the Amended and Restated Certificate of Designation (the Certificate) executed pursuant to the Agreement.  Capitalized terms used herein without definition have the meanings assigned to them in the Agreement and the Certificate.

In the Agreement, Treasury committed itself to provide to the Enterprise, on the terms and conditions provided in the Agreement, immediately available funds in an amount determined from time to time as provided in the Agreement, but in no event in an aggregate amount exceeding $100,000,000,000. In consideration for Treasury's commitment, the Enterprise agreed to sell, and did sell, to Treasury 1,000,000 shares of senior preferred stock, in the form of Variable Liquidation Preference Senior Preferred Stock of the Enterprise with terms set forth in the Certificate, and an initial liquidation preference equal to $1,000 per share.

The Agreement provides that the aggregate liquidation preference of the outstanding shares of senior preferred stock shall be automatically increased by an amount equal to the amount of each draw under Treasury's funding commitment, and the Certificate originally provided that the senior preferred stock shall accrue dividends at the annual rate per share equal to 10 percent on the then-current liquidation preference.

Treasury and the Enterprise have heretofore entered into:

(a) the Amendment dated as of May 6, 2009, to the Agreement, in which Treasury increased to $200,000,000,000 the maximum aggregate amount permitted to be provided to the Enterprise under the Agreement, and amended the terms of the Agreement in certain other respects;

(b) the Second Amendment dated as of December 24, 2009, to the Agreement, in which Treasury modified the maximum aggregate amount permitted to be provided to the Enterprise under the Agreement, as previously amended, by replacing the fixed maximum aggregate

amount with the new formulaic maximum amount specified therein, and amended the terms of the Agreement, as previously amended, in certain other respects; and,

(c) the Third Amendment dated as of August 17, 2012, to the Agreement, in which the Enterprise modified the dividend rate provision set forth in the Certificate, and amended the terms of the Agreement, as previously amended, in certain other respects.

Treasury and the Enterprise are each authorized to enter into this letter agreement further amending the Certificate by modifying the dividend and liquidation preference provisions of the senior preferred stock sold by the Enterprise to Treasury. Therefore, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Treasury and the Enterprise agree as follows:

## Fourth Quarter Dividend

Section 2(a) of the Certificate provides that Treasury, as the holder of outstanding shares of Senior Preferred Stock of the Enterprise, shall be entitled to receive, when, as, and if declared by the Board of Directors, in its sole discretion, cumulative cash dividends quarterly on each Dividend Payment Date. The Enterprise agrees to declare and pay the dividend payable to Treasury for the Dividend Period that ends on December 31, 2017 in an amount equal to the Dividend Amount minus $2,400,000,000 (the Q4 Dividend).

## Applicable Capital Reserve Amount

Section 10(g)(ii) of the Certificate provides that the consent of Treasury, as the holder of at least two-thirds of the outstanding shares of Senior Preferred Stock, is necessary to authorize any amendment of the Certificate affecting the interests of the holders. Effective upon receipt of the Q4 Dividend, Treasury agrees that the Enterprise will either amend the Certificate, or issue a replacement Certificate, in either case so that, effective January 1, 2018, paragraph 2(c) reads as follows:

(c) For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, "Dividend Rate" means 10.0 percent; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) the "Dividend Rate" shall mean 12.0 percent.

For each Dividend Period from January 1, 2013, and thereafter, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter, less the Applicable Capital Reserve Amount for such Dividend Period, exceeds zero. In each case, "Net Worth Amount" means (i) the total assets of the Company (such assets excluding the Commitment and any unfunded amounts thereof) as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP, less (ii) the total liabilities of the Company (such liabilities excluding any obligation in respect of any capital stock of the Company, including this Certificate), as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP.

2

"Applicable Capital Reserve Amount" means, as of any date of determination, (A) for each Dividend Period from January 1, 2013, through and including December 31, 2013, $3,000,000,000; (B) for each Dividend Period occurring within each 12-month period thereafter, through and including December 31, 2017, $3,000,000,000 reduced by $600,000,000 for each such 12-month period, so that for each Dividend Period from January 1, 2017, through and including December 31, 2017, the Applicable Capital Reserve Amount shall be $600,000,000; and (C) for each Dividend Period from January 1, 2018, and thereafter, $3,000,000,000. Notwithstanding the foregoing, for each Dividend Period from January 1, 2018, and thereafter, following any Dividend Payment Date with respect to which the Board of Directors does not declare and pay a dividend or declares and pays a dividend in an amount less than the Dividend Amount, the Applicable Capital Reserve Amount shall thereafter be zero. For the avoidance of doubt, if the calculation of the Dividend Amount for a Dividend Period does not exceed zero, then no Dividend Amount shall accrue or be payable for such Dividend Period.

For the avoidance of doubt, following the amendment of the Certificate as provided in this Letter Agreement, Section 2 of the Certificate, as amended hereby, shall be deemed to be in form and content substantially the same as the form and content of the Senior Preferred Stock in effect on September 30, 2012.

**Increase in Liquidation Preference**

The Enterprise and Treasury agree that, notwithstanding Sections 2(b) and 8(b)(iii) of the Certificate, the Liquidation Preference shall be increased by $3,000,000,000 on December 31, 2017.

Sincerely,

Steven T. Mnuchin

Agreed and Accepted:

Federal Home Loan Mortgage Corporation, by
Federal Housing Finance Agency, its Conservator

Melvin L. Watt
Director

3

## ADDENDUM TO COMPLAINT

**DEFENDANTS' ADDRESSES**

The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Christopher S. Lynch
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Raphael W. Bostic
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Carolyn H. Byrd
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Lance F. Drummond
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Thomas M. Goldstein
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Richard C. Hartnack
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Steven W. Kohlhagen
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Donald H. Layton
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Sara Mathew
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Saiyid T. Naqvi
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Nicolas P. Retsinas
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Eugene B. Shanks
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Anthony A. Williams
c/o The Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr.
McLean, VA 22102

Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

Egbert L.J. Perry
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

Amy E. Alvin
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

William T. Forrester
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

Brenda J. Gaines
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

Frederick B. Harvey III
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

Robert H. Herz
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

Timothy J. Mayopoulous
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

Diane C. Nordin
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

Jonathan Plutzik
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

David H. Sidwell
c/o Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC 20016

The Federal Housing Finance Agency as Conservator for The Federal Home Loan Mortgage
Corporation and ~~The Home Loan Mortgage Association~~
Constitution Center
400 7th Street, SW
Washington, DC 20219

THE HOME LOAN MORTGAGE ASSOCIATION
CONSTITUTION CENTER
400 7TH STREET SW
WASHINGTON, DC 20219